#23839-a-DG

**2007 SD 15**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

  v.

RALPH BUCHHOLD,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JEFF W. DAVIS
Judge

* * * *

LAWRENCE E. LONG
Attorney General

STEVEN R. BLAIR
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                    and appellee.

BRIAN L. UTZMAN
ALAN L. SMOOT
Smoot & Utzman
Rapid City, South Dakota                    Attorneys for defendant
                    and appellant.

* * * *

ARGUED AUGUST 30, 2006

OPINION FILED **01/31/07**

#23839

GILBERTSON, Chief Justice

[¶1.] Ralph Buchhold (Buchhold) was convicted by a jury of one count of second degree rape, six counts of third degree rape, and four counts of sexual contact with a child under the age of sixteen. He was sentenced to 25 years in the state penitentiary on the second degree rape count and 15 years on each of the third degree rape and sexual contact counts. The sentences are to be served consecutively. We affirm.

## FACTS AND PROCEDURE

[¶2.] A child, (hereinafter referred to as A.B.), was born to Ralph and Kathleen Buchhold on August 22, 1988. During the initial years of A.B.'s life, Buchhold was largely absent from the home. He served overseas as an active duty member of the United States Air Force.

[¶3.] Buchhold was discharged from the Air Force on January 1, 1995. At that time he joined his family in Rapid City, South Dakota. During the next few years, A.B., who was seven when her father returned from the Air Force, enjoyed a fairly normal upbringing. The Buchholds welcomed a second daughter into their family in 1998.

[¶4.] A.B.'s life began to change in 1999, after her eleventh birthday. During this time, A.B.'s father, Buchhold, began to make sexual advances towards her. This started when Buchhold came into A.B.'s room one day and began touching her in the breast area on the outside of her clothes. Although A.B. did not understand the inappropriateness of the act at this time, it made her uncomfortable. She attempted to slide away from Buchhold. Buchhold persisted and once again made inappropriate contact with A.B. on the outside of her clothes.

-1-

This initial episode ended when Buchhold left A.B.'s room after she yelled at him and shoved him away.

[¶5.]    The first encounter was followed by another in A.B.'s bedroom where Buchhold placed his hands inside A.B.'s pants. Buchhold told A.B. at this time that she was made for his pleasure. This episode again ended when A.B. shoved Buchhold away.

[¶6.]    Following these initial episodes, A.B. told her mother, Kathleen, about what her father had been doing to her. Kathleen confronted Buchhold about the allegations, but came away from the meeting distrusting A.B. After this meeting, Buchhold told A.B. that if she would keep her mouth shut the sexual advances would not happen again. However, within a short period of time Buchhold's behavior resumed and his sexual advances became more extreme.

[¶7.]    A.B. was still eleven years old the first time she was raped by her father. Buchhold ordered A.B. into his room where he removed A.B.'s clothes and forced her, kicking and crying, to have vaginal sex with him. A.B. continued to cry complaining about the pain that the penetration was causing her. Buchhold dismissed A.B.'s pleas and finally subdued her struggling by squeezing his hand around her throat until she ceased.

[¶8.]    Thus, began an ordeal for A.B. that lasted four years. During this period, Buchhold's rape and sexual abuse of his daughter escalated to an almost daily occurrence. It was not until A.B. was 15 that she was able to overcome her fear and humiliation in order to report the abuse from Buchhold. On December 13, 2003, a Rapid City police officer was dispatched to the Buchhold residence in response to a reported rape.

#23839

[¶9.]　　　On February 12, 2004, Buchhold was indicted by a Pennington County Grand Jury on one count of second degree rape, six counts of third degree rape and four counts of sexual contact with a minor. A warrant was immediately issued for Buchhold's arrest. Aware that he was about to be arrested, Buchhold left South Dakota to do a "photo shoot." He traveled to various places under an assumed name. A Canadian by birth, he tried to arrange the purchase of a home in Canada under the name Thomas Keyes. Before he reached Canada, however, he was apprehended in New Jersey on May 14, 2004.[1] Buchhold made his initial appearance on all charges before a Pennington County Magistrate on June 24, 2004. His trial commenced on July 13, 2005.

[¶10.]　　　During the trial, A.B. testified to at least ten separate instances of rape or sexual contact perpetrated upon her by her father. In addition A.B. testified that from 1999 through 2003, like instances of rape and sexual contact escalated from a once or twice weekly occurrence to as frequent as every other day or almost daily. Dr. Lori Strong, a pediatrician specializing in the treatment of children who suffer sexual and other physical abuse, testified on direct examination by the State that a vaginal examination of A.B. revealed a hymenal irregularity. The doctor asserted that this irregularity could not have existed from birth and was not attributable to any sort of natural infirmity such as a urinary tract infection. In Dr. Strong's opinion A.B.'s hymenal irregularity was due to a penetration injury. She stated that this kind of injury was consistent with someone experiencing a history of sexual abuse like that relayed by A.B.

---

1.　　　His jury was given the pattern "flight" instruction.

-3-

[¶11.]     Prior to trial, the State gave notice of its intent to elicit testimony about statements of a sexual nature allegedly made to other young women by Buchhold. The circuit court ruled that the statements would not be admissible since they were not similar to the charges Buchhold faced; thus, being unduly prejudicial and not evidence of motive, opportunity, intent, preparation, or absence of mistake or accident in relation to the charges. *See* SDCL 19-12-5 (Rule 404(b)).

[¶12.]     During the trial, the State played a videotape of an interview of Buchhold conducted by Pennington County Sheriff's Deputy, Misti Walker. Due to a redaction error the jury was allowed to hear a portion of the videotape that included the statement from Walker to Buchhold, "Her friends say that you make these sexual com—. . . ." Defense counsel moved for a mistrial contending that the intent of the court's ruling at the Rule 404(b) hearing had been violated. The circuit court denied the motion on the ground that the fragmentary statement did not violate the intent of the Rule 404(b) ruling and thus was not unduly prejudicial to Buchhold's ability to have a fair trial.

[¶13.]     Following the conclusion of the first day of the trial, Buchhold was escorted from the courtroom by a uniformed deputy sheriff. He was apparently placed in restraints in preparation for transport back to the Pennington County jail after leaving the courtroom. He was then taken by the deputy to await an elevator. Before Buchhold could board the elevator, four jurors, who had inadvertently been excused, saw him shackled under the supervision of the deputy. Though defense counsel did not ask for a mistrial, he did discuss the incident with the circuit court. The circuit court, aware of the incident, noted that the jurors had immediately

returned to the courtroom without any resulting effect. Considering there to be no prejudicial consequence to Buchhold, the judge dismissed the incident.

[¶14.]    Finally, during closing arguments, the state's attorney recalled for the jury the testimony of Dr. Strong. He specifically recounted the doctor's discussion about the hymenal irregularity. The state's attorney reiterated Dr. Strong's contention that the irregularity was consistent with what one might find in a child who had been the victim of prolonged sexual abuse. He concluded this discussion by stating that it was another piece of the puzzle and convincing evidence beyond a reasonable doubt that rape had occurred. Defense counsel had no objection to the state's attorney's statement.

[¶15.]    Buchhold was found guilty on all eleven counts on July 14, 2005. On September 6, 2005, he was given the maximum sentence on all counts to be served consecutively; thus, totaling 175 years.

[¶16.]    On appeal, Buchhold raises six issues:

1.    Whether Buchhold was properly convicted of and sentenced on the mutually exclusive crimes of third degree rape and sexual contact with a minor under the age of sixteen.
2.    Whether sentencing Buchhold to the maximum allowable on each count, to be served consecutively, constitutes cruel and unusual punishment.
3.    Whether the statutory 180-day rule was violated.
4.    Whether the circuit court erred when it failed to grant Buchhold's motion for a mistrial when the State failed to redact portions of a videotape that was shown to the jury.
5.    Whether Buchhold's ability to have a fair trial was unduly prejudiced when members of the jury saw him in restraints while in the custody of a sheriff's deputy.
6.    Whether the state's attorney committed prosecutorial misconduct when referencing expert testimony during closing arguments.

## STANDARD OF REVIEW

[¶17.] "In determining the sufficiency of the evidence on review, the question presented is whether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt." State v. Lewandowski, 463 NW2d 341, 343-44 (SD 1990). This Court reviews sentencing within statutory limits under the abuse of discretion standard. State v. McKinney, 2005 SD 73, ¶10, 699 NW2d 471, 476 (citing State v. Goodroad, 1997 SD 46, ¶40, 563 NW2d 126, 135 (citing State v. Anderson, 1996 SD 46, ¶30, 546 NW2d 395, 402)). "We give 'great deference to sentencing decisions made by trial courts.'" State v. Garber, 2004 SD 2, ¶13, 674 NW2d 320, 323 (quoting State v. Milk, 2000 SD 28, ¶10, 607 NW2d 14, 17 (citing State v. Gehrke, 491 NW2d 421, 422 (SD 1992))). However, when a defendant challenges a sentence on Eighth Amendment grounds, our review is conducted using the gross disproportionality standard set out in State v. Bonner, 1998 SD 30, ¶17, 577 NW2d 575, 580. "[T]his Court reviews 'the determination of whether the 180-day period has expired as well as what constitutes good cause for delay under a de novo standard.'" State v. Cottrill, 2003 SD 38, ¶6, 660 NW2d 624, 628 (quoting State v. Sparks, 1999 SD 115, ¶5, 600 NW2d 550, 553). "The denial of a motion for mistrial is reviewed under an abuse of discretion standard." State v. Janklow, 2005 SD 25, ¶42, 693 NW2d 685, 699 (citing State v. Ball, 2004 SD 9, ¶16, 675 NW2d 192, 197). Where an issue has not been preserved by objection at trial, this Court's review is limited to consideration of whether the circuit court committed plain error. State v. Nelson, 1998 SD 124, ¶7, 587 NW2d 439, 443 (citing State v. Satter, 1996 SD 9, ¶11, 543 NW2d 249, 251).

## ANALYSIS AND DECISION

[¶18.]   1.   **Whether Buchhold was properly convicted of and sentenced on the mutually exclusive crimes of third degree rape and sexual contact with a minor under the age of sixteen.**

[¶19.]   Buchhold argues that there is not sufficient evidence to support a finding of guilt on the eleven separate counts for which he was convicted. Specifically, Buchhold contends the only evidence supporting the multiple counts was "the very general" and "uncorroborated" testimony of A.B. Buchhold was convicted of four counts of sexual contact with a minor. He asserts that A.B.'s testimony only supports two counts of sexual contact. He then concludes the only basis under which more counts could be rationalized would be to assume sexual contact occurred coincident with incidences of rape. Buchhold asserts that our legislature did not intend for sexual contact and rape crimes to be cumulative.

[¶20.]   Buchhold reasons that under SDCL 22-22-7,[2] sexual contact with a child under the age of sixteen is a mutually exclusive offense from that of rape under SDCL 22-22-1.[3] Buchhold points to the usage of the term "sexual contact" in

---

2.   SDCL 22-22-7 provides in part:  "Any person, sixteen years of age or older, who knowingly engages in sexual contact with another person, other than that person's spouse if the other person is under the age of sixteen years is guilty of a Class 3 felony. . . ."

3.   At the time of Buchhold's offenses, SDCL 22-22-1(2004) provided in part: "Rape is an act of sexual penetration accomplished with any person under any of the following circumstances:

. . .

(2)   Through the use of force, coercion, or threats of immediate and great bodily harm against the victim or other persons within the

(continued . . .)

SDCL 22-22-7 and its definition under SDCL 22-22-7.1,[4] as the basis for the mutual exclusivity of "rape" and "sexual contact" crimes as intended by our legislature.

[¶21.] Buchhold cites a litany of cases decided by this Court that resulted in the reversal of convictions for mutually exclusive offenses based on the same set of facts. *See* State v. Purovich, 2001 SD 96, 632 NW2d 12; State v. Dillion, 2001 SD 97, 632 NW2d 37 (holding that convictions for rape and pedophilia based on one act violated the prohibition against double jeopardy where the legislature did not specifically intend for multiple punishments for the same conduct); *Interest of* C.H., 2001 SD 119, 634 NW2d 309 (vacating two convictions for sexual contact incidental to rape because the legislature did not intend for cumulative punishments for one act of sexual penetration); State v. Brammer, 304 NW2d 111 (SD 1981) (holding that convictions for the mutually exclusive crimes of rape and sexual contact were substantially prejudicial to the defendant under the plain error rule).

[¶22.] Buchhold failed to seek dismissal at trial of any of the counts under that he now claims to have been improperly charged. We must therefore consider

_____

(. . . continued)

>    victim's presence, accompanied by apparent power of execution; or

>    . . .

>    (6) If persons who are not legally married and who are within degrees of consanguinity within which marriages are by the laws of this state declared void pursuant to § 25-1-6, which is also defined as incest; . . ."

4. At the time of Buchhold's offenses, SDCL 22-22-7.1 (2004) provided in part: "As used in this chapter, the term, sexual contact, means any touching, not amounting to rape, . . . of the breasts of a female or the genitalia or anus of any person with the intent to arouse or gratify the sexual desire of either party. . . ."

this issue from the perspective of whether the circuit court committed plain error in entering convictions on all charges. *See Satter*, 1996 SD 9, ¶11, 543 NW2d at 251. "Plain error requires (1) error, (2) that is plain, (3) affecting substantial rights; and only then may this Court exercise its discretion to notice the error if (4) it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Nelson*, 1998 SD 124, ¶8, 587 NW2d at 443 (citation omitted).

[¶23.]    A.B. testified that the first time Buchhold came to her room and touched her in a sexual manner, she pushed him away. A.B. then stated that her father initiated a second sexual contact during this incident. A.B. later testified that the next time A.B. made sexual advances, he placed his hands inside her pants. This constitutes three acts of sexual contact rather than the two that Buchhold claims.

[¶24.]    Buchhold also fails to address the sheer magnitude of the number of sexual acts he committed against A.B. A.B. testified that when her father started sexually abusing her it was with a frequency of once or twice a week, "not that often." Later it progressed to two or three times a week and by the time she was in the eighth grade it was occurring somewhere between every other day and every day. A.B. asserts that the total number of times she was sexually abused by her father were too numerous for her to count.

[¶25.]    This Court must accept the evidence, and the most favorable inferences that can be drawn from it, which will sustain a verdict. State v. Buchholz, 1999 SD 110, ¶33, 598 NW2d 899, 905 (citation omitted). This Court will

not pass on the credibility of witnesses or weigh the evidence in determining its sufficiency. *Id*. (citation omitted).

[¶26.] Clearly, the jury considered A.B.'s testimony to be credible. It is entirely possible that given the hundreds of acts of sexual abuse perpetrated upon A.B. by her father, the jury may have inferred that at least one additional count of sexual contact existed. Thus, the circuit court could not be held to be in error for accepting the jury's finding of fact as to the sufficiency of evidence supporting eleven separate counts.

[¶27.] **2. Whether sentencing Buchhold to the maximum allowable on each count, to be served consecutively, constitutes cruel and unusual punishment.**

[¶28.] Buchhold received the maximum available sentence on all eleven counts for which he was convicted; thus, totaling 175 years. He will not be eligible for parole until he has served half of his sentence or 87½ years. Buchhold was 50 years old when sentenced. He therefore argues that he has received a de facto life sentence and otherwise cruel and unusual punishment given the circumstances in violation of the Eighth Amendment.

[¶29.] In *Bonner*, we set out the proportionality test used by this Court to review a defendant's challenge to a sentence on Eighth Amendment grounds.

> To assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the Legislature and the sentencing court. If these circumstances fail to suggest gross disproportionality, our review ends.

*Bonner*, 1998 SD 30, ¶17, 577 NW2d at 580 (citing Harmelin v. Michigan, 501 US 957, 1000, 111 SCt 2680, 2704, 115 LEd2d 836, 868 (1991)). Only when a sentence

appears grossly disproportional will this Court conduct an inter/intra-jurisdictional sentencing analysis or assess other factors. *Id.* ¶21 (citing *Harmelin,* 501 US at 1000, 111 SCt at 2704, 115 LEd2d at 868).

[¶30.] In order to apply the test set out in *Bonner* to this case, we must first determine if the issue of gross disproportionality is confined to the sentences imposed for each individual conviction or whether it extends to the consecutive sentencing scheme. The United States Supreme Court has not provided a clear answer to this question. Lockyer v. Andrade*,* 538 US 63, 72, 123 SCt 1166, 1173, 155 LEd2d 144 (2003). However, we take note of the statement pertaining to this issue from the early case of *O'Neil v. Vermont*, 144 US 323, 12 SCt 693, 36 LEd 450 (1892). Though not central to the holding in that case, the Court recognized that the length of a defendant's sentence may be attributable to the number of crimes committed which of itself does not raise proportionality concerns:

> The punishment imposed by statute for the offence with which the respondent, O'Neil, is charged, cannot be said to be excessive or oppressive. If he has subjected himself to a severe penalty, it is simply because he has committed a great many such offences. It would be scarcely competent for a person to assail the constitutionality of the statute prescribing a punishment for burglary, on the ground that he had committed so many burglaries that, if punishment for each were inflicting on him, he might be kept in prison for life. The mere fact that cumulative punishments may be imposed for distinct offences in the same prosecution is not material upon this question.

*Id*. at 331, 12 SCt at 696-97, 36 LEd 450.

[¶31.] Several lower courts have dealt with this issue and concluded that the gross disproportionality review applies to the sentence imposed for the individual crimes rather than the consecutive aggregate. In *United States v. Aiello*, 864 F2d 257, 265 (2dCir 1988), the court also took notice of the reasoning from *O'Neal*,

holding that a proportionality analysis did not apply to a defendant's life sentence without parole plus 140 consecutive years because the analysis properly focuses on the sentence applied for each specific crime and not cumulative sentencing. In supporting the same proposition, the court in *United States v. Schell*, 692 F2d 672, 675 (10thCir 1982) reasoned that concluding otherwise would mean that any sentence regardless of length could be deemed cruel and unusual punishment when imposed on a defendant already serving lengthy sentences for prior convictions. Similarly, the court in *Person v. Ramos*, 237 F3d 881, 886 (7thCir 2001) predicted the absurd result of prisoners that would generate colorable Eighth Amendment claims by simply committing more crimes.

[¶32.]        Other jurisdictions have also considered the issue of proportionality where consecutive sentencing is involved. The Arizona Supreme Court has concluded that defendant's have no constitutional right to concurrent sentencing for multiple separate crimes. State v. Jonas, 792 P2d 705, 712 (Ariz 1990) (citations omitted). Recently, the Arizona court concluded that even when consecutive sentences exceed life expectancy, it cannot be argued that a sentence that is not alone grossly disproportional becomes so because it is lengthy in aggregate with other sentences. State v. Berger, 134 P3d 378, 384 (Ariz 2006) (citation omitted). In *Close v. People*, 48 P3d 528, 540 (Colo 2002), the Colorado Supreme Court held that cumulative sentences are not reviewable in aggregate. In *State v. August*, 589 NW2d 740, 744 (Iowa 1999), the Iowa Supreme Court noted that an Eighth Amendment claim does not arise where a defendant who commits multiple crimes is punished more severely than a defendant who commits one.

[¶33.] We conclude that the imposition of consecutive sentencing is a discretionary matter for the sentencing court in line with SDCL 22-6-6.1.[5] In *State v. Blair*, we justified in part the circuit court's imposition of five consecutive eight year terms against the defendant by reasoning that each of the five counts was individual and specific to one of his five victims. 2006 SD 75, ¶66, 721 NW2d 55, 72. The same rationale applies to this case because even though A.B. was the only victim of Buchhold's crimes, each instance of sexual abuse was a separate offense committed at different times.

[¶34.] Defense counsel argues that in imposing sentence the circuit court "disregarded" the psychosexual evaluator's conclusions that Buchhold does not have "a chronic objectively sexual interest in young children" or an "objectively measured interest in sexual violence." According to the evaluator, Buchhold's test scores suggested that he is a "low risk for recidivism." Nonetheless, it must be noted that the evaluator's entire assessment was prefaced with the comment that Buchhold's

---

5. At the time of Buchhold's conviction SDCL 22-6-6.1 (2004) provided:

> If a defendant has been convicted of two or more offenses, regardless of when the offenses were committed or when the judgment or sentence was entered, the judgment or sentence may be that the imprisonment on any of the offenses or convictions may run concurrently or consecutively at the discretion of the court.

"continued denial is viewed as an indicator of his failure to take responsibility for his sexual behavior problems and a lack of forthrightness on this assessment." Thus, the test scores showing Buchhold to be a low risk are of dubious worth.

[¶35.] During the sentencing hearing, the circuit court stated that in addition to the evidence presented at trial, it considered the pre-sentence investigation and psychosexual evaluation. This evaluation revealed that Buchhold is in "deep denial" of the molestation he perpetrated against A.B. Instead of accepting responsibility for his acts, Buchhold depicted his daughter as mentally unstable and a habitual liar. As the trial court noted, his continued denial left him unamenable to treatment or the possibility of rehabilitation: "It would appear to me, sir, based on the entire record before me, that there is no prospect of rehabilitation in the foreseeable future in your particular instance and that the only way to protect society is to remove you from society." Thus, in total we conclude the circuit court acted within its discretion by sentencing Buchhold to eleven consecutive sentences.

[¶36.] The next step in our analysis is to determine whether the individual sentences are grossly disproportionate. The first step in establishing whether a threshold showing of gross disproportionality in sentencing exists is to determine whether the legislature had a rational basis to conclude the statutory sentencing guidelines would further the objectives of the State's criminal justice system. *See* Ewing v. California, 538 US 11, 28, 123 SCt 1179, 1189, 155 LEd2d 108 (2003). We then decide whether a defendant's sentence is grossly disproportionate to the crime by determining whether that sentence furthers those objectives the legislature sought to advance. *Id.* at 29-30, 123 SCt at 1190, 155 LEd2d 108.

[¶37.]     The legislature has determined that sex crimes against children are a serious public concern and should be punished severely.  State v. Guthmiller, 2003 SD 83, ¶48, 667 NW2d 295, 311.  At the time Buchhold was charged, second degree rape carried a maximum 25-year sentence while the crimes of third degree rape and sexual contact each carried a maximum sentence of 15 years.  The statutory sentencing structure established for these crimes can reasonably be construed to further the State's public policy of deterrence through correction and retribution.  *See Ewing*, 538 US at 28, 123 SCt at 1189, 155 LEd2d 108; *Harmelin*, 501 US at 1003, 111 SCt at 2706, 115 LEd2d 836 (Kennedy, J., concurring in part and concurring in the judgment) (citations omitted).

[¶38.]     The legislature's establishment of this sentencing structure, providing a range of punishment up to the statutory maximum, reveals its intent to invest sentencing courts with the discretion to hand down harsher sentences for those committing the most egregious examples of the crimes.  *See Guthmiller*, 2003 SD 83, ¶44, 667 NW2d at 309; Weems v. United States, 217 US 349, 367, 30 SCt. 544, 549, 54 LEd 793, 798.  This case illustrates an example of the kind of egregious violation justifying imposition of the maximum sentence available under the statutes.

[¶39.]     Buchhold sexually violated his daughter through force and coercion constituting second degree rape, third degree rape, and sexual contact with a child.  A.B.'s extended exposure to Buchhold's sexual abuse has all but destroyed her family life.  She no longer has any apparent emotional feeling for either of her

parents. She has been separated from two younger sisters for whom she still feels great emotional attachment.

[¶40.] Buchhold's intentional conduct occurred repeatedly over a period of approximately four years and likely has resulted in irreparable emotional harm to A.B. We can reasonably conclude that imposition of the maximum sentence in this case for convictions on the individual counts advances, through correction and retribution, the State's interest in deterring such crimes. We therefore conclude in this case that imposition of the maximum sentence for the individual charges is not grossly disproportional and our review of this issue is complete.

[¶41.] **3.     Whether the statutory 180-day rule was violated.**

[¶42.] Buchhold argues that he is entitled to a dismissal with prejudice on all counts because the time between his initial appearance and trial exceeded the statutory 180-day period provided under SDCL 23A-44-5.1.[6] The following is a chronology of the period between Buchhold's initial appearance and trial:

1.     June 24, 2004:  Buchhold makes his initial appearance.

2.     June 30, 2004:  Arraignment.

---

6.     SDCL 23A-44-5.1 provides in part:
   (1)     Every person indicted, . . . for any offense shall be brought to trial within one hundred eighty days, and such time shall be computed as provided in this section.
   (2)     Such one-hundred-eighty-day period shall commence to run from the date the defendant has first appeared before a judicial officer on an indictment,. . .
        . . .
   (5)     If a defendant is not brought to trial before the running of the time for trial, as extended by excluded periods, the defendant shall be entitled to a dismissal with prejudice of the offense charged and any other offense required by law to be joined with the offense charged.

3. July 7, 2004: Buchhold files a request with circuit court for recusal of the Honorable Mertin B. Tice (including removal affidavit attached).

4. July 19, 2004: Status hearing (rescheduled do to change of presiding judge).

5. July 26, 2004: Motions hearing.

6. August 2, 2004: Status hearing.

7. September 13, 2004: Motions hearing. Buchhold makes oral motion to release seized property.

8. September 14, 2004: Motion by original trial counsel to withdraw because Buchhold retained new counsel.

9. September 17, 2004: Order granting September 14, 2004 motion.

10. October 5, 2004: Order granting September 13, 2004 motion.

11. December 15, 2004: Original trial date. Cancelled. New trial date scheduled for April 20, 2005.

12. January 10, 2005: Status hearing.

13. January 21, 2005: Buchhold files 19 pretrial motions. These motions include a request for order permitting Buchhold to be transported for a medical examination. In addition, motions include request for production of records, medical reports, disclosure of State's Rule 404(b) evidence, State's witness list and pretrial discovery.

14. January 31, 2005: Motions hearing.

15. February 18, 2005: State files Rule 404(b) notice.

16. February 28, 2005: Motions hearing.

17. March 7, 2005: Status hearing.

18. March 7, 2005: Circuit court order that all Department of Social Services records, pertaining to A.B. requested by Buchhold, be sent to the circuit court for in-camera review.

19. March 21, 2005: Status hearing.

20. April 6, 2005: Circuit court releases memorandum stating that in-camera records have been reviewed and will be released to the parties.

21. April 6, 2005: Hearing is held to consider State's Rule 404(b) notice.

22. April 20, 2005: Buchhold's second trial date. Trial is continued due to significant health problems of defense counsel.

23. May 11, 2005: State asks for continuance of June 8, 2005 trial date due to unavailability of State's expert, Dr. Strong.

24. May 13, 2005: Circuit court grants continuance and reschedules trial for July 13, 2005.

25. July 7, 2005: Circuit court orders that Buchhold be transported for medical examination.

26. July 13, 2005: Buchhold's trial commences.

[¶43.] Three hundred and eighty-five days passed between Buchhold's June 24, 2004 initial appearance and commencement of trial on July 13, 2005. However, SDCL 23A-44-5.1(4) provides for conditions under which the 180-day clock shall be tolled. Included in these conditions are continuances granted at the request or with the consent of the defendant or defense counsel so long as there is a written order filed by the court. SDCL 23A-44-5.1(4)(b).

[¶44.] Buchhold argues that defense counsel's request for continuance of the April 20, 2005 trial date should not be excluded from the 180-day computation because there was no written order filed by the circuit court. However, when the trial opened, defense counsel addressed the 180-day issue. He specifically made reference to his request for continuance of the April 20 trial date due to his serious health problems that required hospitalization. Defense counsel also made reference to the many motions and status hearings he had requested. In total, defense

counsel did not believe that given the number of defense initiated delays there was any justification for dismissal under the 180-day rule. The circuit court concurred with defense counsel's assessment of the merits of a motion for dismissal based on a 180-day rule violation stating on the record that the proceedings are within the requirements of the statute.

[¶45.] Additionally, this Court has held, " '[W]here a defendant assents to a period of delay and later attempts to take advantage of it, courts should be loathe to find a violation of an accused's speedy trial rights.' " *Cottrill*, 2003 SD 38, ¶11, 660 NW2d at 630 (quoting Hays v. Weber, 2002 SD 59, ¶23, 645 NW2d 591, 599 (quoting State v. Beynon, 484 NW2d 898, 903 (SD 1992))). There is nothing in the record indicating that Buchhold objected or failed to consent to the April 20 continuance. Thus, the 84-day period between the second trial date on April 20, 2005, and the actual trial, commenced on July 13, 2005, should be excluded.

[¶46.] Further, all but six days of this period are excluded within a 167-day period between a pretrial motion and its final disposition. Periods between a pretrial motion and its final disposition are excluded from the 180-day computation. SDCL 23A-44-5.1(4)(a). The excluded 167-day period began on January 21, 2005, when Buchhold filed his motion for an order permitting transportation for a medical examination. The excluded period ends when the circuit court entered an order on July 7, 2005, granting Buchhold's motion. When added to the remaining six days resulting from the excluded period between trial dates, there is a total of 173 days of excluded time between January 21, 2005, and the trial date on July 13, 2005.

[¶47.]     Buchhold also made a pretrial motion on September 13, 2004, for the release of confiscated property.  The circuit court granted this motion on October 5, 2004.  The excluded time between these dates is 22 days.  In addition, on July 7, 2004, original defense counsel filed for recusal of the first judge assigned to preside over the case.  The motion was granted and resulted in delay of a status hearing to July 19, 2004, for an additional 12 days excluded.  Finally, there were two status hearings in 2004 that would result in at least one day of excluded time for each hearing.

[¶48.]     The sum of excluded days comes to 209.  The time between Buchhold's initial appearance and trial less excluded days is 176.  Since this falls within the statutory provisions, there is no basis for dismissal on this issue.

[¶49.]     **4.     Whether the circuit court erred when it failed to grant Buchhold's motion for a mistrial when the State failed to redact portions of a videotape that was shown to the jury.**

[¶50.]     Buchhold argues that the a fragmentary statement left unredacted in a videotape interview of him by Deputy Walker violated the intent of the circuit court's April 6, 2005 ruling on the State's Rule 404(b) notice.  He contends that he was unduly prejudiced since the jury heard this fragmentary statement, which was related to other sexual comments that he allegedly made to friends of A.B.

> Trial courts have considerable discretion not only in granting or denying a mistrial, but also in determining the prejudicial effect of a witness' statements.  Only when this discretion is clearly abused will this court overturn the trial court's decision.

State v. Anderson, 1996 SD 46, ¶21, 546 NW2d 395, 401 (citations omitted).

[¶51.]     The circuit court did acknowledge the State's redaction error.  However, it went on to point out that the kind of statements it intended to bar could

be found in a transcript of the unedited videotape and that these statements were not heard on the edited version. The circuit court denied the motion because the intent of the prior Rule 404(b) ruling barring such statements had not been compromised. The record does not indicate the circuit court clearly abused its discretion. Therefore, we will not overturn the circuit court's decision on Buchhold's motion.

[¶52.]      **5.**      **Whether Buchhold's ability to have a fair trial was unduly prejudiced when members of the jury saw him in restraints while in the custody of a sheriff's deputy.**

[¶53.]      Buchhold argues that when four jurors saw him in restraints, under the supervision of a deputy sheriff while waiting for an elevator, his presumption of innocence was compromised. Buchhold did not move for mistrial at the time. However, he now contends that a mistrial is required due to plain error.

[¶54.]      Buchhold cites *State v. Mollman*, 2003 SD 150, ¶24, 674 NW2d 22, 29 for the proposition that courts must guard against prejudice arising when a defendant is seen before a jury under restraint or in prison garb. However, this Court in *Mollman* noted: "brief, inadvertent meetings between jurors and a shackled defendant are insufficient to show prejudice." *Id.* ¶27 (citing Harrell v. Israel, 672 F2d 632, 637 (7thCir 1982) (citing United States v. Figueroa-Espinoza, 454 F2d 590 (9thCir 1972); United States v. Leach, 429 F2d 956 (8thCir 1970), *cert. denied,* 402 US 986, 91 SCt 1675, 29 LEd2d 151 (1971); Hardin v. United States, 324 F2d 553 (5thCir 1963))).

[¶55.]      For Buchhold to now show that there was reversible error on this issue, he must show that there exists (1) error, (2) that is plain, (3) affecting

substantial rights such that this Court may exercise its discretion to notice the error if (4) it seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Nelson,* 1998 SD 124, ¶8, 587 NW2d at 443 (citation omitted).

[¶56.] The record shows that the inadvertent incident occurred following the first day's trial proceedings when Buchhold was awaiting transport back to the Pennington County jail. When defense counsel brought the matter to the attention of the circuit court, he apparently doubted the existence of undue prejudice since he elected not to file a motion for mistrial. Nevertheless, the circuit court was aware of the incident and noted that the four jurors who had seen Buchhold promptly returned to the courtroom. The circuit court stated that it did not appear that the incident caused any concern for the jurors. Buchhold cannot show that there was any resultant prejudice and therefore cannot establish there was plain error.

[¶57.] **6. Whether the state's attorney committed prosecutorial misconduct when referencing expert testimony during closing arguments.**

[¶58.] Buchhold argues that the state's attorney made improper statements during closing arguments that substantially prejudiced his ability to have a fair trail. Buchhold did not object to the statements at the time. However, he contends that this Court adopted a new standard in *State v. Ball*, 2004 SD 9, 675 NW2d 192 under which this Court can review prosecutorial misconduct de novo notwithstanding the absence of objection at trial.

[¶59.] Buchhold misinterprets *Ball.* Like the instant case, the defendant in *Ball* alleged that the prosecutor made improper statements during closing arguments amounting to prosecutorial misconduct. *Id*. ¶12. However, unlike the instant case where nothing that could be construed as an objection was offered, in

*Ball* this Court concluded that the defendant preserved an objection during an off-the-record discussion because both the State and the defendant considered it as such in their briefs. *Id.* ¶14 n3. We therefore must consider this issue from the perspective whether the prosecutor's statements constituted plain error.

[¶60.]    The state's attorney essentially restated the findings of Dr. Strong. He stated that A.B. had a penetrating injury that could not have occurred naturally nor existed from birth. He also stated that there was "no report of any other incident that happened to [A.B.]."

[¶61.]    Buchhold contends that the state's attorney's statements were improper because the nature of A.B.'s injury was categorized as inconclusive and that a friend of A.B.'s had testified that A.B. told her she had had sex with two boys in 2003. During Dr. Strong's testimony, she stated that although the injury was not diagnostic of sexual abuse on its own, it was indicative of what could be found in a child relaying a history like that of A.B.

[¶62.]    Whether the jury did or did not conclude that A.B. had sex with boys prior to the time the rape allegations were made against her father, it is possible it concluded that such acts were not "incidents that happened to A.B." The state's attorney merely concluded the penetrating injury was a piece of the puzzle that showed convincingly beyond a reasonable doubt that there was rape. These statements do not rise to the level where they become unduly prejudicial. We therefore find no plain error related to this issue that would justifying reversal.

[¶63.]    Since we find no basis for reversal on any of the issues raised by Buchhold, we affirm.

[¶64.]     KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.

[¶65.]     SABERS, Justice, dissents.


[¶66.]     SABERS, Justice (dissenting).

[¶67.]     This fifty-year-old man received a sentence of 175 years. This sentence constitutes six life sentences when considering Buchhold's age and statistical life expectancy. Even if we consider Buchhold will be eligible for parole in half time served, this sentence effectively amounts to three life sentences.[7] Sentencing him to "de facto" life sentences "eliminates forever any opportunity for hope, self-improvement, and rehabilitation." State v. Pasek, 2004 SD 132, ¶43, 691 NW2d 301, 313 (Sabers, J., dissenting). This sentence is harsh, excessive, grossly disproportionate and wasteful. All this sentence guarantees is that Buchhold will be housed, fed, medically treated and buried at the State's expense when he dies in the South Dakota State Penitentiary. I dissent because we should remand this case to impose a "*meaningful* less than life sentence." *Id.* ¶49.

[¶68.]     *1.     De facto life sentences*

[¶69.]     There must be some hope of rehabilitation. While I do not condone Buchhold's actions, nor minimize their magnitude, some hope should exist in sentencing.

> A life sentence should only be imposed when a trial court "can determine from the facts of the principal offense and the previous convictions that rehabilitation is so unlikely as to be removed from consideration in sentencing; that

---

7.     *See supra* ¶28.

> the interests of society demand that the convict be kept off the streets for the rest of his life . . . ."

*Id.* ¶44 (quoting State v. Pulfrey, 1996 SD 54, ¶18, 548 NW2d 34, 38). Ultimately, we must keep the goals of sentencing in mind and hold firmly to the ideal that a sentence cannot "constitute excessive retribution." *Id.* Buchhold has received three life sentences based on his present age and his average life expectancy. He will not be eligible for parole for 87 and ½ years.

[¶70.] Even the majority opinion points out the "statutory sentencing structure established for these crimes can reasonably be construed to further the State's public policy of deterrence through *correction* and retribution." *Supra* ¶37 (emphasis added) (citing Ewing v. California, 538 US 11, 28, 123 SCt 1179, 1189, 155 LEd2d 108 (2003); Harmelin v. Michigan, 501 US 957, 1003, 11 SCt 2680, 2706, 115 LEd2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment)). Giving a fifty-year-old man a 175-year sentence cannot further the State's policy of deterrence through correction. Leaving Buchhold in the penitentiary without the possibility of parole will never provide correction. It constitutes excessive retribution.

[¶71.] Buchhold's criminal record reveals no prior instances or allegations of sexual misconduct. "[T]he lack of a prior felony conviction or other serious offense aids our decision and 'certainly bears on the question of gross disproportionality.'" State v. Blair, 2006 SD 75, ¶96, 721 NW2d 55, 79 (Sabers, J., dissenting) (quoting State v. Bonner, 1998 SD 30, ¶23, 577 NW2d 575, 581-82). His presentence report

indicated he still maintains his innocence[8] and recommends he be sentenced "for a substantial period of time." However, his sentence of 175 years is much longer than "a substantial period of time." It is effectively three life sentences without the possibility of parole and constitutes excessive retribution. This is the type of excessive punishment that "generate[s] disrespect for the law." *Id.* ¶82, (Konenkamp, J., concurring in result).

[¶72.]     In sentencing, the court should "examine a defendant's 'general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record.' The sentencing court should also consider rehabilitation prospects." State v. Lemley, 1996 SD 91, ¶12, 552 NW2d 409, 412 (internal citations omitted). What rehabilitation prospects can a man have when there is no incentive to rehabilitate? "There should generally be a light at the end of the tunnel for any human no matter how bad he appears or how bad his past conduct reflects he is." Ganrude v. Weber, 2000 SD 96, ¶29, 614 NW2d 807, 813 (Amundson, J., dissenting). We should

---

8.     When reading the sentencing transcript, it appears that Buchhold's maintained innocence weighed heavily in the court's conclusion that Buchhold was not a candidate for rehabilitation and its decision to sentence him to 175 years. The trial judge specifically quoted Dr. Gans who explained he had specific recommendations to treat Buchhold, "[i]f and when Ralph becomes amenable to treatment through the relinquishment of denial." The majority opinion points out Buchhold is in "deep denial" and not amenable "to treatment or the possibility of rehabilitation." *Supra* ¶34-35. Buchhold may never relinquish denial. However, that should be the basis of denying parole. It should not be the basis to deny him even the *opportunity* for parole. Buchhold at some point may atone for his crimes and may be rehabilitated. Without even a chance of parole, it leaves Buchhold without a chance of ever having hope of rehabilitating.

impose a meaningful sentence of less than life to keep that light on and the hope going.

[¶73.]     As Justice Amundson stated,

> It seems as though the result of this sentence is to cast this individual into the human waste dump and let him languish there until he finally totally decomposes and has gasped his last breath. I cannot agree that this should be the severity of the sentence and would hold that a light should remain on at the end of the tunnel for this individual.

*Id.* Again, I do not condone Buchhold's actions, but I cannot condemn him to a life without hope. For this reason, we should vacate these "de facto" life sentences and remand to require the judge to impose a sentence that does not last long beyond the time Buchhold has "gasped his last breath."

[¶74.]     *2.     Gross Disproportionality*

[¶75.]     I also disagree with the majority opinion's gross disproportionality analysis. When conducting gross disproportionality review, the review should entail the aggregate sentence, not the individual sentence on each count. The majority opinion appears to adopt the position advanced in the *Blair* concurrence as the method to conduct a gross disproportionality review when the defendant received consecutive sentences. 2006 SD 75, ¶73, 721 NW2d at 73 (Konenkamp, J., concurring in result). Utilization of this method creates a situation where no sentence could really ever appear to be grossly disproportionate. I reiterate the position advanced in the *Blair* dissent, "[w]hether we measure one grain of sand or one tree at a time, a desert remains a desert and a forest remains a forest." *Id.* ¶109 n33 (Sabers, J., dissenting). Even the *Blair* concurrence concedes there may be a time when the sentences should be reviewed in the aggregate, as opposed to

individually. *Id.* ¶78 n22 (Konenkamp, J., concurring in result). Specifically, the

*Blair* concurrence provided it may be appropriate to view the sentences in the

aggregate when the "consecutive sentences amount[ ] to life in prison." *Id.* This is

the type of sentence that should be reviewed in the aggregate. Buchhold received

ten fifteen-year sentences and one twenty-five year sentence, all to be served

consecutively. This amounts to a 175-year sentence, which is effectively three life

sentences without the possibility of parole.[9]

[¶76.]        Looking at each individual count shows Buchhold received sentences

each within the statutory maximum. While this might be initially reassuring, it

demonstrates a concern when reviewing the counts in isolation. The problem is

that the statutes do not allow a life sentence for Buchhold's charged crimes.[10] The

most severe crime he was charged and convicted of is second degree rape, which is a

---

9.    Buchhold was fifty-years old when he was sentenced. He will not be eligible
      for parole for 87 and ½ years. Whether we view the 175-year sentence as six
      or three life sentences is irrelevant. By the time Buchhold is eligible for
      parole, he will be dead or 137 and ½ years old.

10.   SDCL 22-6-1 provides, in relevant part:

      Except as otherwise provided by law, felonies are divided into the
      following nine classes which are distinguished from each other by the
      following maximum penalties which are authorized upon conviction:

      (1) Class A felony:  death or life imprisonment in the state
      penitentiary. A lesser sentence than death or life imprisonment may
      not be given for a Class A felony. In addition, a fine of fifty thousand
      dollars may be imposed;

      (2) Class B felony:  life imprisonment in the state penitentiary. A
      lesser sentence may not be given for a Class B felony. In addition, a
      fine of fifty thousand dollars may be imposed;

                                                                (continued . . .)

#23839

Class 2 felony punishable by twenty-five years in the state penitentiary. Examining the counts in isolation, rather in the aggregate, results in Buchhold receiving a sentence that the statute did not initially allow. Conducting proportionality review in this manner encourages prosecutors to charge as many counts as possible to ensure a higher sentence that will not appear grossly disproportionate. That violates the spirit of *Bonner* and the law of the State of South Dakota. *See Blair,* 2006 SD 75, ¶109 n33, 721 NW2d at 82 n33 (noting "the words 'Equal Justice Under Law' call for more than just a lofty inscription") (Sabers, J., dissenting) (citing *Bonner*, 1998 SD 75, ¶12, 577 NW2d at 578). All this sentence guarantees is that Buchhold will be housed, fed, medically treated and buried at the State's expense when he dies in the South Dakota State Penitentiary.

---

(. . . continued)

(3) Class C felony: life imprisonment in the state penitentiary. In addition, a fine of fifty thousand dollars may be imposed;

(4) Class 1 felony: fifty years imprisonment in the state penitentiary. In addition, a fine of fifty thousand dollars may be imposed;

(5) Class 2 felony: twenty-five years imprisonment in the state penitentiary. In addition, a fine of fifty thousand dollars may be imposed;

(6) Class 3 felony: fifteen years imprisonment in the state penitentiary. In addition, a fine of thirty thousand dollars may be imposed[.]