#24777-a-JKK

**2008 SD 121**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                                    Plaintiff and Appellee,

    v.

MICHAEL A. IANNARELLI,                                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE RONALD K. ROEHR
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

SHERRI SUNDEM WALD
Deputy Attorney General                          Attorneys for plaintiff
Pierre, South Dakota                             and appellee.

ROGER W. ELLYSON                                  Attorney for defendant
Watertown, South Dakota                          and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
AUGUST 26, 2008

OPINION FILED **12/17/08**

#24777

KONENKAMP, Justice

[¶1.]     Michael Iannarelli pleaded guilty but mentally ill to first degree manslaughter and second degree rape. He was sentenced to 130 years for manslaughter and 45 years for rape, the sentences to run consecutively. On appeal, Iannarelli contends that his sentences were grossly disproportionate to the crimes committed. We affirm because the sentences were not grossly disproportionate to the offenses committed.

## BACKGROUND

[¶2.]     In the early morning hours of February 15, 2007, Michael Iannarelli was having difficulty sleeping. He had suffered from this condition for many years. Life was stressful in the Iannarelli home. Tammy, Michael's wife of nine years, suffered from transverse myelitis[1] which left much of her body paralyzed or numb. The family was deeply in debt. Tammy's medical expenses and Michael's inability to find work created financial turmoil.

[¶3.]     After doing small tasks around the home, Iannarelli entered his step-daughter's, A.S., bedroom and had a brief conversation with her. He informed A.S. that he had the "feeling [he] had to do something evil." Over A.S.'s protest,

---

1.    "Transverse myelitis is a neurological disorder caused by inflammation across both sides of one level, or segment, of the spinal cord. The term *myelitis* refers to inflammation of the spinal cord; *transverse* simply describes the position of the inflammation, that is, across the width of the spinal cord. Attacks of inflammation can damage or destroy myelin, the fatty insulating substance that covers nerve cell fibers. This damage causes nervous system scars that interrupt communications between the nerves in the spinal cord and the rest of the body."
http://www.ninds.nih.gov/disorders/transversemyelitis/detail_transversemyelitis.htm (last visited August 11, 2008).

Iannarelli grabbed A.S.'s left breast and digitally penetrated her vagina. Iannarelli became emotionally upset and asked A.S. if she wanted to call the police. The authorities were not contacted. Iannarelli returned to sleep. In the morning and during the following day, A.S. did not behave as if anything had happened. Iannarelli believed the night's events had been a bad dream.

[¶4.] The next night, February 16, 2007, Iannarelli was again unable to sleep. After hearing a crash in his wife's bedroom, Iannarelli checked in on her and spoke with her briefly. Tammy's condition made it difficult for the couple to share a bed. Later, Iannarelli returned to his wife's bedroom with a hammer and struck her twice in the back of the head. He then strangled her from behind. Iannarelli realized he had blood on his shirt and beard. He washed himself off in the bathroom sink. Iannarelli carried the hammer with him to the bathroom. When it was discovered there, the hammer was still bloody and had strands of Tammy's hair stuck to it.

[¶5.] After cleaning himself, Iannarelli entered A.S.'s bedroom with two neckties, a head-wrap and a bottle of K-Y lubricant. A.S. awoke to find Iannarelli sitting on her floor. Iannarelli stood up and tied both of A.S.'s arms to the bed with the neckties and head scarf. A.S. exclaimed that the restraints hurt her wrists; Iannarelli did not loosen the bonds. A.S. screamed for help; Iannarelli warned her that no one would hear her or come to her aid. A.S. struggled against him; Iannarelli stripped off her night clothes, poured lubricant on her body and penetrated her vagina with his penis. When Iannarelli had finished, he sat on A.S.'s bed and smoked a cigarette.

[¶6.] After finishing his cigarette, Iannarelli freed A.S. He had tied the knots so tightly that he had to cut her bonds with a pair of scissors. When A.S. asked about her mother, Iannarelli replied she was "in her room." Iannarelli told A.S. to wait in the bedroom until the police arrived.

[¶7.] Iannarelli made a pot of coffee and dialed 911.

[¶8.] An indictment, filed on February 26, 2007, charged Iannarelli with one count of first degree murder or, in the alternative, one count of second degree murder, and one count of second degree rape. Several motions were filed by the parties and granted. These motions included Iannarelli's request for a psychiatric examination and the State's notice of intent to seek the death penalty. The court also approved Iannarelli's requests for a second attorney to aid in his defense and to sever the rape from the murder trial, fearing the circumstances of the two crimes would be highly prejudicial to Iannarelli's defense.

[¶9.] On October 11, 2007, after the psychiatric evaluation determined that Iannarelli was not insane at the time of the crimes, Iannarelli and the State entered into a plea agreement. As a part of this agreement, Iannarelli pleaded guilty but mentally ill to manslaughter in the first degree and second degree rape. The agreement detailed the maximum penalties Iannarelli faced for these crimes: life without the possibility of parole for manslaughter and fifty years for rape. The agreement avoided the potential of a death penalty.

[¶10.] Before sentencing, the court obtained a pre-sentence report, additional psychiatric evaluations, and victim impact statements. The psychiatric evaluations suggest that, based on Mr. Iannarelli's actions and history, he is a "high risk to the

community" whose prognosis for amenability to treatment is "questionable at best." Iannarelli had no prior felony convictions. On December 21, 2007, Iannarelli was sentenced to 130 years for manslaughter and 45 years for rape, the terms to be served consecutively. Iannarelli appeals.

## ANALYSIS AND DECISION

**Whether a 130-year sentence for manslaughter in the first degree or a 45-year sentence for second degree rape is grossly disproportionate to the crime committed and unconstitutional under the Eighth Amendment.**

[¶11.] Iannarelli contends his 130-year sentence for manslaughter, considered alone or with the consecutive 45-year rape sentence, constitutes a de facto life sentence. Despite receiving less than the maximum authorized penalty for either crime, Iannarelli asserts that taken individually, or in tandem, such punishment is grossly disproportionate to the crime committed in violation of the Eighth Amendment prohibition on cruel and unusual punishment.

[¶12.] "It is well-settled that we employ very limited principles in our constitutional review of sentences. These principles include giving 'substantial deference' to the legislature's broad authority to determine the types and limits of punishment; and the notion that 'the Eighth Amendment does not mandate adoption of any one penological theory.'" State v. Dubois, 2008 SD 15, ¶41, 746 NW2d 197, 210 (quoting State v. Garber, 2004 SD 2, ¶28, 674 NW2d 320, 327 (citations omitted)). Consequently, a sentence within the statutory maximum will

#24777

rarely be disturbed. *Id.* This Court applies the gross disproportionality[2] test when assessing the constitutionality of a particular sentence. State v. Williams, 2006 SD 11, ¶12, 710 NW2d 427, 431.

> [To] assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the Legislature and the sentencing court. If the sentence does not appear grossly disproportionate, no further review is necessary. If the sentence does appear grossly disproportionate, an intra-and inter-jurisdictional analysis shall be conducted. We also consider "the gravity of the offense and the harshness of the penalty;" and other relevant factors, such as the effect this type of offense has on society.

*Id.* (quoting State v. Guthmiller, 2003 SD 83, ¶43, 667 NW2d 295, 309) (citations omitted). It is a "rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Bonner*, 1998 SD 30, ¶27, 577 NW2d at 582 (quoting Harmelin v. Michigan, 501 US 957, 1005, 111 SCt 2680, 2707, 115 LEd2d 836, 871 (1991)). Finally, rather than evaluating Iannarelli's cumulative sentence, as he suggests, each count of the sentence is examined individually.[3] *Buchhold*, 2007 SD 15, ¶¶30-32, 727 NW2d at 823-24.

---

2.    Iannarelli's reliance on the "shock the conscience" standard is unfounded. The "shock the conscience" test is no longer applicable to Eighth Amendment challenges. *See* State v. Bonner, 1998 SD 30, ¶13, 557 NW2d 575, 579.

3.    Iannarelli states that his convictions "as a practical matter [are] the fundamental equivalent of life imprisonment without parole." As a legal matter, they are not. These are two separate crimes with two separate penalties. The punishment for each must be considered individually. State v. Buchhold, 2007 SD 15, ¶¶30-32, 727 NW2d 816, 823-24.

[¶13.]     An examination of Iannarelli's conduct underlying both of these counts does not lead to an inference of gross disproportionality.  Iannarelli acted against members of his family, while they slept in their beds.  Both were physically incapacitated, either due to illness or by the actions of Iannarelli.  His psychiatric reports conclude that he was aware of the wrongness of his conduct at the time he committed these acts.  Despite his mental afflictions, his actions were not sudden or instantaneous.  Iannarelli took time between every step.  Iannarelli attacked Tammy from behind with a weapon he brought into the bedroom.  In addition to bludgeoning Tammy with the hammer, he strangled her with his hands.  He then washed the gore from his beard and shirt before attacking A.S.

[¶14.]     The rape was the second act of sexual violence against the fourteen-year-old victim.  Iannarelli entered A.S.'s room already carrying tools to facilitate his crime.  He waited on the floor of her room smoking a cigarette until she awoke.  After the attack, he smoked another cigarette on her bed, where she lay bound, naked and crying.  Only then did he free her, contact the police, and self-report.

[¶15.]     Beyond characterizing his punishment as a "life sentence," Iannarelli's argument essentially maintains that the sentencing court did not give adequate consideration to his prospects for rehabilitation.  He relies on State v. Weiker,[4] 342

_____

4.     Weiker's life sentence was remanded for resentencing because the goal of rehabilitation was not adequately considered by the trial court.  Weiker faced a life sentence due to penalty enhancements as a habitual offender (previous minor property crimes).  This Court deemed the penalty too harsh for the crime he later committed (drug dealing).  Such rationale is inapplicable to Iannarelli for at least three reasons:  1) Iannarelli did not receive a life sentence; 2) unlike Weiker, Iannarelli has committed violent crimes leading to his long-term incarceration; and 3) the sentencing court did consider

(continued . . .)

NW2d 7 (SD 1983), and State v. Hinger,[5] 1999 SD 91, 600 NW2d 542. Iannarelli consistently overlooks the pre-sentence report and psychological evaluations which discuss the severity and brutality of his offenses, his inability to recall why he committed these acts, and the effect both of these circumstances have on his prospects for rehabilitation. It is unknown what motivated Iannarelli to commit these appalling crimes. Iannarelli concedes that his conduct for both crimes is "unexplainable." These aspects of the killing and rape contribute to the bleak assessment for Iannarelli's rehabilitation.

[¶16.]     Iannarelli pleads for leniency because of his formerly clean criminal record. Criminal history is but one aspect of a person's profile; it alone is not determinative. Other historic facts are also relevant to one's prospects. Iannarelli's past conduct includes a voluntary psychiatric hospitalization due to his fear that he might kill someone. Considering the mental illness under which Iannarelli pleaded guilty, his history of mental health problems relating to violence is highly relevant to sentencing.

[¶17.]     As Iannarelli's counsel stated at sentencing ". . . there's no case that I know of where a Court has more great (sic) discretion than first degree manslaughter." However, Iannarelli suggests that the circuit court abused its

_____

(. . . continued)
     Iannarelli's rehabilitation prospects included in the pre-sentence investigation.

5.     Hinger's life sentence for first degree rape was remanded for a factual assessment of Hinger's prospects for rehabilitation. Iannarelli, again, overlooks the thorough psychological profiles considered by the sentencing court which both suggest little chance of rehabilitation.

discretion with the sentence it imposed. The only justification Iannarelli presents against deference to the manslaughter sentence is an intra-jurisdictional comparison, inappropriate at this phase of analysis.[6]

[¶18.] In regard to the second charge, the South Dakota Legislature has recently elevated the classification of second degree rape from a Class 2 to a Class 1 Felony. SDCL 22-22-1(2), SL 2005, ch 120, § 390. Accordingly, the maximum penalty has increased from twenty-five to fifty years. Clearly, the Legislature believes that fifty years is a justifiable maximum punishment for this crime.

[¶19.] Based upon the standard of review, given the nature of Iannarelli's criminal acts, his past conduct and mental history, and considering the deference accorded the Legislature and the sentencing court, it does not appear that either the 130-year sentence for the manslaughter of Tammy or the 45-year sentence for the rape of A.S. is grossly disproportionate to the respective offenses. Because the first prong of the disproportionality test has not been satisfied, no further analysis is necessary.

[¶20.] Affirmed.

[¶21.] GILBERTSON, Chief Justice, and ZINTER and MEIERHENRY, Justices, concur.

[¶22.] SABERS, Justice, concurs specially.

---

6. Because the analysis has not yet reached the second prong of the gross disproportionality test, Iannarelli's intra-jurisdictional argument that his sentence is "over three times [the] average" given for first degree manslaughter in South Dakota since 2004 is premature. *See* State v. McKinney, 2005 SD 73, ¶10 n4, 699 NW2d 471, 476 n4.

#24777

SABERS, Justice (concurring specially).

[¶23.]     I concur specially because it is hard to believe that the psychiatric evaluator concluded that Iannarelli was not insane at the times he committed these senseless and repulsive crimes.  In light of all of the facts and circumstances, it seems the only reasonable conclusion is that Iannarelli *was* insane when he committed the offenses.  Nevertheless, the evaluator's determination and the circuit court's acceptance of that determination leave little ground to challenge the process.

[¶24.]     As to the 130-year sentence, I continue to stand on my dissent in *Buchhold*, 2007 SD 15, ¶¶66-76, 727 NW2d 816, 830-32 (Sabers, J., dissenting).  I recognize, however, that the maximum punishment for this crime is life imprisonment, and the 130-year sentence does not exceed that.  This is in line with our holding in *State v. Tiegen*, 2008 SD 6, ¶48, 744 NW2d 578, 594, where we held, in part, that the defendant's 100-year sentence for kidnapping was within the statutory maximum of life imprisonment and was not grossly disproportionate.