2005 SD 73

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Patrick Ryan McKINNEY, Defendant and Appellant.**

No. 23374.

Supreme Court of South Dakota.

Considered on Briefs on April 25, 2005.

Decided June 15, 2005.

See also __ N.W.2d __.

Lawrence E. Long, Attorney General, John M. Strohman, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Julie Hofer, Hofer Law Office, Sioux Falls, South Dakota, Attorney for defendant and appellant.

ZINTER, Justice.

[¶ 1.] A jury convicted Patrick Ryan McKinney of first-degree rape, sexual contact with a child under sixteen years of age, and sexual exploitation of a minor. McKinney appeals raising issues concerning his sentence, his right of confrontation, the sufficiency of the evidence, and a child abuse expert's opinion evidence. We affirm.

## Facts and Procedural History

[¶ 2.] McKinney and Colleen O'Bleness met in early 2001. After O'Bleness' husband died in May 2001, she began dating McKinney. In August 2001, McKinney moved into O'Bleness' home, where she lived with her two daughters; K.H., who was fourteen years old at the time of trial and J.H., who was nine years old at trial. McKinney and O'Bleness were married on February 16, 2002.

[¶ 3.] In January 2003, O'Bleness and McKinney began having marital problems because McKinney was not contributing financially to the household. After confiding in her pastor about her marital troubles, after seeing adult pornography on the computer in their bedroom, and after noticing that McKinney had changed his password without telling her, O'Bleness decided to find out if he was spending money on pornography. O'Bleness had a program installed on the computer that identified a variety of photographs and files that could be pornographic, including twenty to thirty pornographic pictures of young children. After finding the pictures, O'Bleness turned the computer over to the police and had McKinney removed from the home.

[¶ 4.] O'Bleness subsequently told her daughters that she was going to talk to the police about some inappropriate and illegal things that she had found on the computer. J.H. responded that she could prove McKinney had pictures on the computer because she had seen a picture of a "naked girl." J.H. also testified that, one time when she was playing on the computer, McKinney told her that he wanted to show her something. J.H. indicated that McKinney then showed her "a little movie type thing" in which a man was licking a little girl "on her private[s]." On another occasion, when O'Bleness and her other daughter were not at home, J.H. was shown a movie on a DVD. J.H. testified that this movie involved adults who were not wearing any clothes. Although she tried to leave while the movie was playing, McKinney prevented her from leaving the room.[1]

[¶ 5.] At some point during this same period, J.H. developed an infection that required application of a vaginal medication. O'Bleness usually applied the medication after J.H. took her evening bath. One night, J.H. was home alone with McKinney. After taking her evening bath and getting ready for bed, McKinney reminded her that she had not yet applied

---

1. J.H. testified that she did not want to watch the movie with McKinney, but when she tried to leave, he grabbed her and said "don't leave. I want you to watch this." McKinney then prevented J.H. from leaving by laying behind her and putting his arm around her.

her medication. McKinney offered to apply the medication even though J.H. told him that she did not want him to because her mother was not there. J.H. later agreed to let McKinney insert the medication but, when he attempted to do so, she told him to stop because she was uncomfortable. McKinney then told J.H. that he could apply the medicine with his finger and she told him to stop after he had used his finger. McKinney then licked her in her vaginal area and told her that his licking her would help her infection. Although J.H. told him to stop, he kept licking until he heard a car door slam. McKinney told J.H. not to tell anyone about the incident.

[¶ 6.] J.H. testified that on another occasion McKinney had shown her a vibrator when her mother and sister were not at home. J.H. stated that McKinney had also turned the vibrator on and put it directly on her "private parts."

[¶ 7.] After this abuse came to light, J.H. met with Colleen Brazil, a forensic interviewer from Child's Voice, a medical evaluation center where children are evaluated for possible physical and sexual abuse. During this interview, J.H. made several statements to Brazil about McKinney's sexual abuse. The interview was videotaped and played for the jury.

[¶ 8.] The jury convicted McKinney of all three charges. McKinney was sentenced to fifty years for rape, fifteen years for sexual contact with a child less than sixteen years of age, and two years for sexual exploitation of a minor, all to be served consecutively. McKinney's motion for a new trial was denied. McKinney now appeals raising the following issues:

(1) Whether the trial court's consecutive sentence of 67 years for three offenses was cruel and unusual punishment under the Eighth Amendment;

(2) Whether the use of J.H.'s hearsay statements to the forensic interviewer denied McKinney the right to confront and cross-examine the witnesses against him;

(3) Whether the evidence was sufficient to find McKinney guilty beyond a reasonable doubt;

(4) Whether the trial court abused its discretion by allowing a child abuse expert to testify.

*(1) Constitutionality of Sentence*

[¶ 9.] McKinney was sentenced to a total of sixty-seven years for the three convictions; first-degree rape, sexual contact with a child under age sixteen, and sexual exploitation of a minor. The three convictions arose from three separate incidents. Additionally, in a related criminal action, he was sentenced to one hundred years for twenty felony convictions for possessing child pornography.[2] However, McKinney contends that the sixty-seven year sentence was "extremely severe and is, in reality, a life sentence."[3] Prior to all of these incidents, he had no criminal record. Therefore, McKinney argues that the sentence is "grossly disproportionate to the offense[s] committed" in violation of the Eighth Amendment.

[¶ 10.] Our standard of review on this issue is well settled.

"[To] assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the con-

**2.** *State v. McKinney*, 2005 SD 74, 699 N.W.2d 460.

**3.** The sixty-seven year sentence in this case was to be served concurrently with the one hundred year sentence in the pornography case.

duct involved, and any relevant past conduct, with utmost deference to the Legislature and the sentencing court." If the sentence does not appear grossly disproportionate, no further review is necessary. If the sentence does appear grossly disproportionate, an intra- and inter-jurisdictional analysis shall be conducted. We also consider "the gravity of the offense and the harshness of the penalty;" and other relevant factors, such as the effect this type of offense has on society.[4]

*Guthmiller,* 2003 SD 83, ¶ 43, 667 N.W.2d at 309 (internal citations omitted). However, "limited principles [are used] in our constitutional review of sentences." *State v. Garber,* 2004 SD 2, ¶ 28, 674 N.W.2d 320, 327 (citing *State v. Milk,* 2000 SD 28, ¶ 14, 607 N.W.2d 14, 18). These limiting principles require " 'substantial deference to the legislature's broad authority to determine the types and limits of punishment' and [adherence to] the notion that 'the Eighth Amendment does not mandate adoption of any one penological theory.' " *State v. Pasek,* 2004 SD 132, ¶ 33, 691 N.W.2d 301, 311 (citations omitted). We ultimately review a sentence within statutory limits under an abuse of discretion standard. *State v. Goodroad,* 1997 SD 46, ¶ 40, 563 N.W.2d 126, 135 (citing *State v. Anderson,* 1996 SD 46, ¶ 30, 546 N.W.2d 395, 402).

[¶ 11.] McKinney argues his sentence was grossly disproportionate because it was the legislature's "intent to reserve the most severe sanctions for the most serious combinations of the offense and the background of the offender." *State v.* *Bonner,* 1998 SD 30, ¶ 25, 577 N.W.2d 575, 582 (citation omitted). However, the range of sanctions authorized for first-degree rape is a mandatory minimum ten-year sentence to a maximum sentence of life imprisonment without parole. SDCL 22–22–1.2(1), SDCL 22–6–1, and SDCL 24–15A–32. Therefore, because McKinney was not sentenced to life, his reliance upon the "most serious sanction" language of *Bonner* has little application here.

[¶ 12.] Moreover, McKinney's pre-sentence investigation justified his sentence. That investigation revealed that McKinney had an admitted interest in sadism and in having sex with strangers. He was a member of several online pornographic websites and had recently been convicted of twenty felonies involving child pornography. In a sexual-psychological assessment, McKinney scored in the "low to moderate" range to re-offend, but he continued to deny any of the sexual misconduct. Thus, his realistic chances of successful treatment and rehabilitation were questionable at best. As we stated in *State v. Clegg,* 2001 SD 128, ¶ 6, 635 N.W.2d 578, 580:

> [A]fter exercising the right to trial, a defendant's continued refusal to take accountability may be considered as a sign of lack of remorse. *State of Wisconsin v. Fuerst,* 181 Wis.2d 903, 915, 512 N.W.2d 243, 247 (1994). "Repentance has a role in penology. But the premise of our criminal jurisprudence has always been that the time for repentance comes after trial." *Scott v. United States,* 419 F.2d 264, 270 (D.C.Cir.1969). A sentencing court may consider a defen-

---

4. McKinney asks us to compare and contrast his sentence to the sentences given for rape and criminal pedophilia in *State v. Hinger,* 1999 SD 91, 600 N.W.2d 542; *State v. Guthmiller,* 2003 SD 83, 667 N.W.2d 295; and, *State v. Herrmann,* 2004 SD 53, 679 N.W.2d 503. We decline to do so for two reasons.

First, under our standard of review, we do not engage in intra-jurisdictional analysis unless we first find gross disproportionality. We also decline because McKinney was sentenced to a term of years rather than the life sentences given in each of these other cases.

dant's denial as part of its decision whether the defendant can be successfully rehabilitated. Rehabilitation must begin with an offender's acknowledgment of personal fault.

[¶ 13.] Furthermore, although not initially used in determining gross disproportionality, we may consider "the consequences of [the defendant's] acts upon the victims and society" in ultimately determining the constitutionality of the sentence. *Bonner*, 1998 SD 30, ¶ 22, 577 N.W.2d at 581 (citing *Harmelin v. Michigan*, 501 U.S. 957, 1000, 111 S.Ct. 2680, 2704, 115 L.Ed.2d 836, 868 (1991)). In this case, J.H. wrote a letter to the trial court in which she described the consequences of McKinney's misconduct. J.H. wrote: "I'm glad I stopped [McKinney] before he did anything bad to someone else. *I think about it every single day* and *wish that I could be someone else* and have someone else have it happen to them ... *I'll remember it for my whole life* ... [H]e's tricky and bad." (Emphasis added.) Thus, while McKinney could have received a life sentence, but did not, J.H. may possibly suffer lifetime consequences of the abuse. These consequences further justify McKinney's sentence.

[¶ 14.] McKinney finally asserts that because the trial court made no findings regarding his potential for rehabilitation, his case should be remanded to the trial court for such a determination. We encourage, and have often required, the consideration of the potential for rehabilitation. *See State v. Hinger*, 1999 SD 91, ¶ ¶ 24–25, 600 N.W.2d 542, 549–50; *Bult v. Leapley*, 507 N.W.2d 325 (S.D.1993). In this case, we note that the trial court did not make specific findings on McKinney's potential for rehabilitation, but it did consider McKinney's rehabilitative prospects by its review of the pre-sentence investigation and the sexual rehabilitative assessment.

[¶ 15.] When the offense of rape or sexual contact with a child under sixteen is committed, an assessment that includes rehabilitative prospects is required by statute. SDCL 22–22–1.3 requires that:

> Any person convicted of a violation listed in § 22–22–1.2 shall have included in his presentence investigation report an assessment which shall include the following information: the offender's sexual history; intellectual, adaptive and academic functioning; social and emotional functioning; previous legal history; previous treatment history; victim selection; risk to the community; and treatment options recommended.

McKinneys assessment indicated that he was first exposed to pornography when he was nine; he had had nine previous sexual partners, not including this victim; and two of his sexual experiences were with prostitutes. Although he denied making sexual movies or photographs, he admitted viewing pornography on the Internet as a member of several sites. He also acknowledged sadomasochistic behaviors and having sex with strangers. Psychological testing revealed that McKinney had attempted to place himself in an "overly positive" light by minimizing his faults and denying problems. The testing also revealed that McKinney may have a possible adjustment disorder with "mixed disturbance of emotions" and some passive/aggressive and anti-social traits. McKinney scored in the low to moderate range to reoffend, and it was recommended that if he were ever granted probation or parole, that he participate in a sex-offender treatment group. However, he continues to deny his misconduct, and therefore, as previously mentioned, his prospects for rehabilitation and treatment are poor. Because the record reflects that the trial court considered these facts, we conclude

that a remand for specific findings on rehabilitative prospects is not required in this case.

[¶ 16.] In the final analysis, we note that McKinney was convicted of first-degree rape for penetrating J.H. with his tongue and finger; sexual contact for his use of a vibrator on J.H. when he was approximately twenty-three or twenty-four years old and she was seven or eight; and sexual exploitation for forcing J.H. to watch child and adult pornography. Each of these convictions involved separate incidents. Moreover, McKinney was convicted of twenty counts of child pornography during this same period of time. Given the totality of McKinney's conduct, the possible lifelong effect his actions may have upon J.H., and his questionable prospects for rehabilitation, we conclude that his sentence was not grossly disproportionate.

### (2) Hearsay Testimony of J.H.— Right to Confrontation

[¶ 17.] Pursuant to SDCL 19–16–38,[5] J.H.s hearsay statements to Colleen Brazil

were admitted at trial. McKinney contends that *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), applies to his case.[6] McKinney contends that under *Crawford*, his motion for a new trial should have been granted because he did not have an adequate opportunity to cross-examine J.H. McKinney argues that he was denied this opportunity because J.H. could not or did not answer certain questions during cross-examination and was, therefore, "unavailable."

[¶ 18.] Both the United States Constitution and the South Dakota Constitution provide the right to confront and cross-examine the witnesses against a criminal defendant. U.S. Const. amend. VI; S.D. Const. art. VI, 7. "[A]n alleged violation of [this] constitutionally protected right is a question of law" reviewed de novo. *State v. Carothers*, 2005 SD 16, ¶ 7, 692 N.W.2d 544, 546 (citations omitted).

[¶ 19.] *Crawford* overruled *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65

---

5. SDCL 19–16–38 provides:
   A statement made by a child under the age of ten, or by a child ten years of age or older who is developmentally disabled as defined in § 27B–1–3, describing any act of sexual contact or rape performed with or on the child by another, or describing any act of physical abuse or neglect of the child by another, or any act of physical abuse or neglect of another child observed by the child making the statement, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings against the defendant or in any proceeding under chapters 26–7A, 26–8A, 26–8B, and 26–8C in the courts of this state if:
   (1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and
   (2) The child either:
   (a) Testifies at the proceedings; or
   (b) Is unavailable as a witness.
   However, if the child is unavailable as a witness, such statement may be admitted

only if there is corroborative evidence of the act.
   No statement may be admitted under this section unless the proponent of the statement makes known his intention to offer the statement and the particulars of it, including the name and address of the declarant to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet the statement.

6. The trial in McKinney's case concluded in February 2004, before *Crawford* was decided. We apply *Crawford* to cases in which the trial was completed and was on appeal before *Crawford* was decided. *Herrmann*, 2004 SD 53, ¶ 21–23, 679 N.W.2d at 510. Other jurisdictions also apply *Crawford* to trials that were completed before the decision was announced. *See Cooper v. McGrath*, 314 F.Supp.2d 967 (N.D.Cal.2004); *Moody v. State*, 277 Ga. 676, 594 S.E.2d 350 (2004); *State v. Cox*, 876 So.2d 932 (La.Ct.App.2004).

L.Ed.2d 597 (1980), which had previously allowed the admission of hearsay statements if they fell within a firmly rooted hearsay exception or contained particularized guarantees of trustworthiness. Although *Crawford* changed these rules and generally prohibited the use of such statements, *Crawford* did permit the admission of hearsay if the witness was "available" for cross-examination at trial.[7] *Id.* at 59, 124 S.Ct. at 1369, 158 L.Ed.2d at ——, n. 9; *Carothers*, 2005 SD 16, 692 N.W.2d 544.

[¶ 20.] The trial court concluded that, because "J.[ ]H. was available for cross-examination at the trial regarding both her trial testimony and the statements made to Brazil (the forensic interviewer) at Child's Voice, McKinney's right to confront his accusers was not denied at the trial." In reviewing this ruling, we assume without deciding that the statements to Brazil were testimonial.[8] We, therefore, must determine whether J.H. was "available" for cross-examination at trial.

[¶ 21.] In *California v. Green*, 399 U.S. 149, 159, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489, 497 (1970), the Supreme Court indicated that for this type of hearsay to be admitted, there must be a "full and effective cross-examination" at trial. In addressing the meaning of a full and effective cross-examination, the Supreme Court stated the question is "whether subsequent cross-examination at the defen-

dant's trial will still afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement." *Id.* at 160–61, 399 U.S. 149, 90 S.Ct. 1930, 1936, 26 L.Ed.2d at 498. However, this does not mean that the cross-examination must be exactly as a defendant wants it. "[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Kentucky v. Stincer*, 482 U.S. 730, 739, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631, 643 (1987) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15, 19 (1985)) (emphasis in original).

[¶ 22.] McKinney argues that his cross-examination was not "full and effective" because on approximately twenty occasions J.H. answered his questions indicating that she "did not know" or "could not remember" certain facts. A detailed review of J.H.'s testimony reflects that these answers were in response to five types of questions. One type involved questions that were withdrawn. Another dealt with questions that were irrelevant to the crimes at issue. The third involved questions that J.H. later answered. The fourth involved less relevant inquiries concerning her memory of things that she may have previously said to Brazil or the prosecuting attorney (during the grand jury proceeding). The last type involved questions

---

7. McKinney contends that because he was not present when J.H. made the statements to Brazil, he did not have an opportunity to cross-examine J.H. when the statements were made, and therefore, the requirements of the Confrontation Clause were violated. We disagree. In *Carothers*, 2005 SD 16, ¶ 10, 692 N.W.2d at 547, we stated that *"Crawford did not suggest that a prior opportunity for cross-examination was ... required if the witness was available for cross-examination at trial."* (Emphasis added.) We concluded that "if the

declarant is available for cross-examination at the trial, 'the Confrontation Clause places no constraints at all on the use of [the declarant's] prior testimonial statements.'" *Id.* ¶ 11.

8. The State has not argued that J.H.'s statements to Brazil were non-testimonial in nature. Rather, the State's argument focuses solely on J.H.'s availability and ability to be cross-examined. Therefore, we do not address the "testimonial" issue.

about the sexual abuse that J.H. did not remember or could not answer.

[¶ 23.] Of the twenty non-responsive answers, we observe that one question was withdrawn. Another was irrelevant to McKinney's conduct. Eight questions were rephrased and answered later. And, six involved questions concerning her recollection of what she may have previously said to other people. Thus, on only four occasions during cross-examination did J.H. actually fail to respond to a relevant question about the abuse. Moreover, to the extent that she did not respond to questions asking about her prior statements to Brazil, that information was depicted on the videotape that was played to the jury.

[¶ 24.] We also observe that J.H.'s entire testimony spans almost 60 pages and she affirmatively answered 403 questions (including 122 questions on cross and re-cross-examination). In contrast, J.H. only failed to provide answers to relevant questions on a handful of occasions. Because this record of responses is really no different than most witnesses' courtroom performance, we conclude that the jury was afforded a satisfactory basis for evaluating the truth of the prior statements. Consequently, McKinney was not deprived of the opportunity to cross-examine J.H., and McKinney's motion for a new trial was properly denied.

### (3) Sufficiency of the Evidence

[¶ 25.] At the close of the State's case and at the end of the trial, McKinney moved for a judgment of acquittal. Both motions were denied. McKinney contends that there was insufficient evidence to support the convictions because J.H.'s testimony was inconsistent. McKinney argues that the inconsistencies leave doubt that the State established its case beyond a reasonable doubt.

[¶ 26.] In reviewing a denial of a motion for judgment of acquittal, we determine "whether the 'evidence was sufficient to sustain the convictions.'" *State v. Janklow*, 2005 SD 25, ¶ 16, 693 N.W.2d 685, 693 (citations omitted).

> "In determining the sufficiency of the evidence on appeal in a criminal case, the issue before this Court is whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt." In making that determination, "we accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict." Moreover, "the jury is ... the exclusive judge of the credibility of the witnesses and the weight of the evidence." Therefore, this Court does not resolve conflicts in the evidence, or pass on the credibility of witnesses, or weigh the evidence.

*Pasek*, 2004 SD 132, ¶ 7, 691 N.W.2d at 305 (citation omitted).

[¶ 27.] McKinney's claim of insufficiency of evidence is predicated solely on alleged inconsistent testimony given by J.H. However, our standard of review does not permit us to "resolve ... conflicts in testimony, pass ... on the credibility of witnesses, or weigh ... evidence." *State v. Hage*, 532 N.W.2d 406, 410–11 (S.D. 1995). These matters are left for the jury to determine. *Id.* (citations omitted).

[¶ 28.] Furthermore, J.H.'s testimony was partly corroborated. She testified that McKinney had shown her a movie on the computer in which a man was licking a little girl on her privates while the girl was only wearing a shirt. J.H. also testified that McKinney showed her a movie on DVD involving adults who were not wearing any clothes. J.H.'s testimony concerning the movie on the computer was corroborated by the testimony of Kevin Atkins, a

criminalist/forensic computer analyst. Atkins testified that he found movies of child pornography on the hard drive of the computer and that they were associated with the security ID for McKinney. One of those movies involved a male with his tongue in a young girl's vaginal area, and throughout the movie, the girl was only wearing a shirt. Additionally, J.H.'s mother testified that she knew McKinney had two adult pornographic movies.

[¶ 29.] Considering the partial corroboration and our standard of review, we conclude that there was sufficient evidence for the jury to convict McKinney.

### (4) Expert Testimony

[¶ 30.] Colleen Brazil, the forensic interviewer, testified for the State. McKinney contends that Brazil's testimony was improperly used to bolster J.H.'s credibility. McKinney asserts that Brazil's testimony "eliminated" the inconsistencies in J.H's testimony. McKinney contends that "Brazil's testimony basically told the jury that if J.H. made inconsistent statements or had lied on a previous occasion, it was because she was only eight years old."

[¶ 31.] "[T]he trial court has broad discretion in regard to the admission of expert testimony." *State v. Edelman,* 1999 SD 52, ¶ 4, 593 N.W.2d 419, 421 (citations omitted). A trial court's decision to admit such testimony will not be reversed absent a clear showing of an abuse of discretion. *State v. Logue,* 372 N.W.2d 151, 156 (S.D.1985) (citations omitted).

[¶ 32.] Generally, "one witness may not testify as to another witness' credibility or truth-telling capacity because such testimony would invade the exclusive province of the jury to determine the credibility of a witness." *State v. Raymond,* 540 N.W.2d 407, 409–10 (S.D.1995) (citations omitted). As allegations of error, McKinney indicates Brazil testified why an eight-year-old child would not be able to accurately state how many times something happened to her and a child may answer a question differently because they may not understand what question they are answering. McKinney also points to a comment that Brazil made explaining that J.H.'s answers may have been inconsistent because she may not have been able to distinguish time periods and she may not have known the meaning of certain words.

[¶ 33.] However, Brazil's testimony was, for the most part, a generalized explanation of a child's capacity to testify based upon their developmental traits. This included such things as how children tell stories; the lack of cognitive ability of children; the fact that children are not developmentally ready to give accurate estimates of dates, times, etc.; and that sexual abuse may adversely affect a child's memory. Brazil also indicated that some children do not have an understanding of how to order or number things when they are telling a story and that questions need to be asked in a very specific way so that the child understands exactly what is being asked.

[¶ 34.] Brazil further explained other problems with child testimony. She indicated that adults often assume children understand questions, possibly resulting in a child giving what appear to be inconsistent statements. However, she indicated that the inconsistency can result from how the adult phrased the question. Brazil also described child sexual abuse accommodation syndrome, which produces a group of characteristics often found in children who are abused. Brazil indicated that disclosure of abuse is a process and that a child oftentimes cannot, in one sitting, talk about everything that happened from start to finish with all the details. Brazil finally indicated that eight-and-a-half-year-olds do

not have the cognitive ability to disclose an entire account of a rape or sexual contact.

[¶ 35.] We have allowed this type of testimony when an expert ties general characteristics of sexually abused children to a particular victim. *State v. Floody*, 481 N.W.2d 242, 249 (S.D.1992). In *Floody*, a social worker testified regarding several statements that were made by a child sexual abuse victim. *Id.* We observed that the expert did not directly testify as to the truthfulness of the child's statements, even though the expert's testimony implied that the statements were truthful. *Id.* We concluded that the social worker's testimony had not invaded the province of the jury because her testimony was helpful to the jury in determining whether the interviewing techniques used were suggestive or leading. *Id.* So also, in *State v. Cates*, 2001 SD 99, ¶ 5, 632 N.W.2d 28, 32, a licensed psychologist offered expert testimony explaining "the general characteristics of sexual abuse, the concept of 'delayed reporting,' and the relevance of inconsistencies when a child reports sexual abuse." We again allowed such testimony, concluding that it was "clearly within the bounds" of prior case law. *Id.* ¶ 19.

[¶ 36.] Similarly, Brazil's testimony merely explained that trauma, as well as age, can affect a child's ability to remember and testify. This explanation of the characteristics of a child's testimony was not improper bolstering of the child witness's credibility.

[¶ 37.] Affirmed.

[¶ 38.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP and MEIERHENRY, Justices, concur.