#28640-a-JMK
**2019 S.D. 62**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

HERBERT LEE RICHMOND,                     Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MICHELLE K. COMER
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

ANN C. MEYER
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                          and appellee.


ELLERY GREY of
Grey & Eisenbraun Law
Rapid City, South Dakota                  Attorneys for defendant
                                          and appellant.

* * * *

CONSIDERED ON BRIEFS
ON AUGUST 26, 2019
OPINION FILED **11/13/19**

#28640

KERN, Justice

[¶1.]     Herbert Richmond appeals his conviction of first-degree rape of a child under thirteen.  Richmond alleges that his Sixth Amendment right to confront and cross-examine the witnesses against him was violated by the circuit court's order admitting, as other acts evidence, statements from an unavailable witness.  We affirm.

## Facts and Procedural History

[¶2.]     Herbert Richmond, the defendant in this case and a resident of Spearfish, South Dakota, was a longtime friend of A.M. (DOB 09/06/2004) and her family.  When A.M. was a young child, members of A.M.'s family would drop her off at Richmond's house for the day, but A.M. did not begin spending the night at Richmond's house until after she turned five.  Richmond often purchased food and gifts for A.M., and A.M. called Richmond her "grandpa."  Richmond had more financial resources than A.M.'s family.  He had a pool and a trampoline in his backyard.

[¶3.]     In July 2014, law enforcement investigated an allegation that J.C. (DOB 10/25/2002), a young female close to A.M.'s age, was sexually abused by Richmond while spending time at his home.[1]  J.C. was interviewed at the Children's Home Child Advocacy Center (Advocacy Center), a clinic in Rapid City that conducts forensic interviews of children who are suspected victims of physical and sexual abuse.  During her forensic interview, J.C. accused Richmond of rape.  She told her interviewer, Hollie Strand, that the abuse began "a long time ago," but that

---

1.     A.M. is not related to J.C.

-1-

she did not feel safe disclosing it right away because Richmond said he would kill her parents if she told anyone. J.C. disclosed that the assaults first occurred when she was five or six years old while her family was living with Richmond. Richmond often gave J.C., her two sisters, and her mother gifts and did favors for them.

[¶4.] Because A.M. and her mother (Mother) were also frequently in Richmond's home, law enforcement officers scheduled an interview with A.M. for early September 2014. Around the same time that A.M. went to Rapid City for her forensic interview, Richmond gave A.M. an expensive bike, took her shopping, and took her out to eat. During the interview at the Advocacy Center, A.M. did not disclose any instances of sexual abuse. At some point after the interview, A.M.'s mother allowed Richmond to read the report generated as a result of the interview.

[¶5.] Richmond was charged with several counts of first-degree rape for alleged sexual abuse of J.C. Pursuant to a plea agreement, Richmond entered an Alford plea to abuse or cruelty to a minor, a class 3 felony.[2] He was sentenced on December 15, 2015, to serve five years in the penitentiary, the execution of which was suspended on the condition that he successfully complete a term of probation.

[¶6.] In 2016, Mother lost the financial support of A.M.'s father because he went to prison for a drug offense. Mother turned to Richmond for help, and he agreed that A.M. and Mother could move in with him. While they resided with

---

2. An Alford plea is a plea that allows the defendant "to avoid the risk of trial and obtain the benefit of a favorable plea bargain 'even if he is unwilling or unable to admit his participation in the acts constituting the crime.'" *State v. Engelmann*, 541 N.W.2d 96, 101 (S.D. 1995) (quoting *North Carolina v. Alford*, 400 U.S. 25, 38, 91 S. Ct. 160, 167, 27 L. Ed. 2d 162 (1970)).

Richmond, he continued to buy A.M. toys and gifts. Mother was frequently gone from the home, leaving A.M. alone in Richmond's care.

[¶7.] On June 26, 2016, A.M. was home alone with Richmond when she texted her biological grandmother (Grandma),[3] who lived in a neighboring town that "Grandpa is a pervert," and a "child molester." A.M. confided in Grandma that Richmond had sexually abused her. She expressed her fear of being home alone with him and texted: "Please don't tell my mom grandpa does not w[a]nt dead[sic] in prison." Because Grandma could not drive, she called Richmond and confronted him over the phone. Richmond denied the allegations, but told Grandma he would come get her and bring her to his house. On the way to get Grandma, Richmond took A.M. shopping and bought her gifts.

[¶8.] Grandma did not immediately tell Mother that A.M. had accused Richmond of sexual abuse because A.M. begged her not to, and also because of Grandma's concerns as to how Mother would react to such information. Instead, she decided to pack a suitcase and stay temporarily at Richmond's house with A.M. to protect her. A few days later, at Grandma's suggestion, A.M., Mother, and Grandma went to visit family in North Dakota. While they were away, Richmond called Grandma's phone multiple times but Grandma did not answer. Mother, who was confused by Grandma's decision to ignore Richmond's calls, looked through Grandma's phone and discovered A.M.'s June 26 text messages to Grandma and six

---

3. A.M.'s grandma is not related to Richmond.

or seven more.[4] When Mother confronted her daughter about the messages, A.M. refused to describe the abuse. However, after Mother threatened to take her to the hospital, A.M. agreed to explain what happened by writing her accusation down on a piece of paper. Mother then called Richmond to confront him. Grandmother overheard Richmond tell Mother: "Let me get my affairs in order and then I will shoot myself or kill myself and I will let you pull the trigger."

[¶9.] On July 27, 2016, Mother took A.M. to Massa Berry Clinic in Sturgis, South Dakota and reported the assault. Thereafter, law enforcement scheduled an interview for A.M. at the Advocacy Center. Forensic interviewer Tifanie Petro conducted the interview on August 16, 2016. A.M. told Petro that her "grandpa" had "hurt [her] in many different ways" and described Richmond as a pervert. She told Petro that Richmond sexually abused her for the first time when she was eight. She explained that Richmond threatened to hurt her father unless she kept it a secret. She further reported that it hurt when Richmond put his "thingy" inside her "thingy." When asked whether something came out of Richmond, A.M. described a "sticky white" substance that got on her leg.

[¶10.] After A.M.'s interview, Tom Derby, a detective from the Lawrence County Sheriff's Office, requested that Mother make a recorded phone call to Richmond. Mother agreed, and during the conversation, Mother attempted to elicit incriminating statements from Richmond. In response, Richmond told Mother that "[A.M.]'s the only one that can fix it as far as I'm concerned period." When asked

---

4. A.M. deleted all but two of the messages before her mother could see them.

how A.M. could fix it, Richmond responded: "It depends on what she says, that's all. It depends on what she says and if she's willing to talk to them, or not talk to them or if she says the same thing that she said the last time." He said that there was nothing he could do to fix it and expressed his concern that he'd be "winding— winding up going to prison for life if she[,] you know[,] goes in there and says something."

[¶11.] Richmond requested that Mother provide him with the report from A.M.'s interview at the Advocacy Center, but Mother told him she did not have access to it. He also requested to talk to A.M. to see what she wanted to do. Toward the end of the call, Richmond stated that if A.M. testifies before the grand jury and "says what she said before . . . [t]he only thing I ever do is kiss her on top of the head or whatever, then there's nothing they can do to me period."

[¶12.] On October 13, 2016, Dr. Cara Hamilton conducted a physical examination of A.M. and discovered a notch in her hymen consistent with penetration. Richmond was indicted on November 2, 2016, for two counts of first-degree rape of a child under thirteen. The State also filed a part II information alleging that Richmond was a habitual offender having previously been convicted of child abuse or cruelty to a minor for conduct involving J.C.

[¶13.] On April 3, 2017, the State filed a notice of intent to offer other acts evidence pursuant to SDCL 19-19-404(b) regarding Richmond's alleged sexual abuse of J.C. In its notice, the State requested admission of J.C.'s July 29, 2014 interview report from the Advocacy Center in which J.C. accused Richmond of

sexual abuse under circumstances similar to those alleged by A.M. The State also noticed its intent to call Hollie Strand to testify to the incidents reported by J.C.

[¶14.] On May 30, 2017, the court considered the State's request, and the State indicated its intent to offer the testimony through the forensic interviewer, rather than calling J.C. to testify. The court indicated it would admit the other acts evidence; however, it told the State that it would determine at trial the extent to which the evidence would be allowed.[5]

[¶15.] In November 2017, the State filed a superseding indictment charging Richmond with two additional counts of first-degree rape of A.M. In December, while preparing for trial, the State called J.C.'s mother and requested that she present J.C. as a witness at trial. J.C.'s mother refused to reveal J.C.'s location or otherwise cooperate with the prosecution.

[¶16.] A jury trial was held on March 6–9, 2018. A.M. testified first. She told the jury that Richmond "would play with [her vagina] or he would put his thing inside of [her]." When asked to describe Richmond's "thing," A.M. stated it was the part of the male body located "between [the] upper thighs." Sometimes, A.M. testified, she felt "[s]omething wet and sticky" when Richmond finished with her. When asked where she would feel the wet and sticky substance, A.M. stated, "[N]ormally on my upper thighs." On cross-examination, Richmond's counsel intimated that A.M.'s trial testimony was inconsistent with her statements during

---

5.     Judge Randal Macy presided over these proceedings until his retirement in June of 2017. Judge Comer was assigned the case thereafter.

the forensic interview and suggested that A.M.'s father, rather than Richmond, had raped her.

[¶17.] At the conclusion of the first day of trial, the court held a bench conference outside the presence of the jury for purposes of readdressing its order regarding J.C.'s forensic interview report. The State reminded the court of its previous ruling and that it planned to determine the extent to which the other acts evidence would be permitted based on the testimony elicited at trial. The State argued that the breadth of Richmond's cross examination of A.M., namely his questions suggesting that A.M. fabricated the assaults, opened the door to the admissibility of other acts evidence concerning J.C. The court reserved ruling until the morning of the second day of trial.

[¶18.] The next morning, the State requested that the court admit the video recording of J.C.'s interview at the Advocacy Center in its entirety. It argued Richmond's conviction for child abuse was relevant as other acts evidence because it showed a common scheme, plan, identity, and intent. The State also requested that the court declare J.C. unavailable to testify due to her mother's continued refusal to cooperate with the State's request to produce J.C. as a witness. Defense counsel objected, arguing a violation of Richmond's right to cross-examine his accusers. He also highlighted that the State dismissed the first-degree rape charges against Richmond relating to J.C. Finally, he disagreed that J.C. was unavailable, arguing that the State had sufficient time to locate her and failed to make good faith efforts to do so.

[¶19.]     The court declared J.C. unavailable to testify and ruled in favor of the State on its request to admit the other acts evidence.  In support of its decision, the court found Richmond's previous abuse of J.C. was similar enough to the present case to be admitted for the limited purpose of proving identity and common scheme or plan.  The court also held that J.C.'s statements were "not of a constitutional magnitude" because J.C. was not the victim in the current action and "the evidence [was] only being allowed for a limited purpose."

[¶20.]     The second day of the jury trial began with Grandma's testimony.  During cross-examination, she incorrectly stated that Richmond's charges pertaining to J.C. in the 2015 prosecution had been dismissed, and that he was instead charged with and pled to "terrorist threats" against law enforcement.  This was corrected later through other witnesses.  The State called Strand, the forensic interviewer who had met with J.C. in 2014.  Although Strand confined much of her testimony to interview techniques and her 2014 interview with A.M., Strand briefly discussed the statements J.C. made to her in 2014, including J.C.'s allegation that Richmond had "victimized" her.

[¶21.]     At the start of the third day of trial, the State requested the opportunity to make an additional record regarding the admission of J.C.'s statements.  The State withdrew its request to admit J.C.'s forensic interview video and the transcript of the interview.  However, the State claimed that Grandma's testimony left a false impression with the jury that the charges against Richmond related to J.C. were dismissed entirely.  To clarify the matter for the jury, the State sought admission of Richmond's 2015 conviction.  Richmond did not object to the

admission of his judgment of conviction, and ultimately did not object to the evidence being admitted through the testimony of the prosecutor from Richmond's previous case involving J.C. Thereafter, the State called the prosecutor who had negotiated Richmond's plea agreement to lay the foundation for the judgment. She further testified that the State agreed to reduce Richmond's first-degree rape charges in exchange for his Alford plea to a child abuse charge.

[¶22.] During the trial, the jury also considered testimony from Dr. Hamilton, Petro (A.M.'s 2016 forensic interviewer), Mother, and Detective Derby. At the close of the evidence, the circuit court gave the jury the final instructions of law, which included a limiting instruction informing the jury how to properly consider other acts evidence. The jury found Richmond not guilty of three counts of first-degree rape but convicted him of the fourth count. The court sentenced Richmond to 30 years in the penitentiary. Richmond appeals, alleging the circuit court violated his Sixth Amendment right to confront the witnesses against him.[6]

**Analysis and Decision**

[¶23.] Richmond claims that the circuit court erred in permitting Strand to testify regarding the statements J.C. made during her 2014 Advocacy Center interview.[7] More specifically, Richmond challenges the following portions of the testimony the State elicited at trial:

---

6.   Richmond is represented by different counsel on appeal.

7.   Richmond also challenges the admission of testimony from Petro, who interviewed A.M. in 2016. When Petro was asked about the circumstances surrounding A.M.'s interview in 2014, she explained that "[t]here was another child that had disclosed abuse and there was concern because [A.M.]

(continued . . .)

> **The State:** [W]hen did you interview [J.C.]?
>
> **Strand:** July 29, 2014.
>
> **The State:** And did she reveal that she had been victimized?
>
> **Strand:** Yes.
>
> **The State**: And was this interview tape-recorded?
>
> **Strand:** Yes.
>
> **The State:** Who did she indicate had been abusing her?
>
> **Strand:** Herbert Richmond, who she referred to as Rich.
>
> **The State:** Did she indicate to you when that had first occurred?
>
> **Strand:** She said she believed she was about five or six years old.

Because J.C. did not testify, Richmond claims he was deprived of his Sixth Amendment right to confront and cross-examine the witnesses against him. *See Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Richmond does not challenge the circuit court's ruling on evidentiary grounds beyond claiming his constitutional rights were violated. We review constitutional challenges de novo. *State v. Outka*, 2014 S.D. 11, ¶ 7, 844 N.W.2d 598, 603.

[¶24.]        The Sixth Amendment declares: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In the pivotal United States Supreme Court decision

---

(. . . continued)

had . . . contact with [Richmond], and so they wanted to make sure that nothing had happened." Petro testified that the other child was J.C. Petro's testimony did not contain hearsay statements. Rather, it provided background information illuminating the circumstances of A.M.'s prior interview, a topic on which Richmond's counsel had previously cross-examined A.M. The Confrontation Clause "does not bar out-of-court statements when the statement is not offered to prove the truth of the matter asserted[.]" *State v. Kihega*, 2017 S.D. 58, ¶ 36, 902 N.W.2d 517, 528 (quoting *United States v. James*, 487 F.3d 518, 525 (7th Cir. 2007)).

*Crawford v. Washington,* the Court instructed that the right to confrontation delineated in the Sixth Amendment requires exclusion of out-of-court testimonial statements unless: (1) the witness is declared unavailable to testify; and (2) the defendant had a prior opportunity to cross-examine the witness. 541 U.S. at 68–69, 124 S. Ct. at 1374.

### A. Nature of J.C.'s statements

[¶25.] The lynchpin of a Confrontation Clause analysis under *Crawford* is the difference between testimonial and nontestimonial statements. This is because the Confrontation Clause applies only to testimonial hearsay. *Id.* If the statements are deemed testimonial hearsay, the right to confrontation attaches regardless of whether the challenged evidence satisfies other evidentiary requirements, such as a hearsay exception or the prerequisites for admitting other acts evidence under SDCL 19-19-404(b). *See Crawford*, 541 U.S. at 54–57, 124 S. Ct. 1365–67 (holding the existence of a hearsay exception has no effect on the Confrontation Clause); *see also, e.g., Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009) (applying *Crawford* to 404(b) evidence).[8]

[¶26.] J.C.'s statements, although admitted to prove identity or common scheme or plan, constitute hearsay. "Hearsay means a statement that: (1) [t]he declarant does not make while testifying at the current trial or hearing; and (2) [a]

---

8. Several jurisdictions have applied *Crawford* to evidence involving uncharged crimes offered under 404(b). *People v. Bunyard*, 200 P.3d 879, 888–90 (Cal. 2009), *cert. denied*, 130 S. Ct. 553 (2009); *Bell v. State*, 597 S.E.2d 350, 353 (Ga. 2004); *Moody v. State*, 594 S.E.2d 350, 354 (Ga. 2004). *See also State v. Lawson*, 1 So.3d 516, 526–27 (La. Ct. App. 2008) (indicating that *Crawford* applies to 404(b) evidence, but ultimately finding the statements in question non-testimonial); *accord State v. Barnes*, 854 A.2d 208 (Me. 2004).

party offers in evidence to prove the truth of the matter asserted in the statement." SDCL 19-19-801. Here, J.C.'s declarations were made out of court and presented to the jury for their truth, namely, that Richmond had sexually abused her.

[¶27.]    As for the testimonial or nontestimonial nature of her statements, the United States Supreme Court has not yet provided a comprehensive list of situations that render a hearsay statement testimonial. Instead, it loosely defined testimonial as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 49, 124 S. Ct. at 1363. The Court explained that, at a minimum, testimonial statements include police interrogations and "prior testimony at a preliminary hearing, before a grand jury, or at a former trial[.]" *Id.* at 68, 124 S. Ct. at 1374.

[¶28.]    For all other statements, the Court outlined three categories that would render a statement testimonial. The first class, according to the Court, is "*ex parte* in-court testimony or its functional equivalent, . . . or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *Id.* at 51–52, 124 S. Ct. at 1364. The next group consists of statements "contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *Id.* at 52, 124 S. Ct. at 1364. As to the final class, statements are testimonial if they are "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* In outlining these classifications, the Supreme Court identified certain types of hearsay evidence that are categorically non-testimonial. These

include business records and statements in furtherance of a conspiracy.[9] *Id.* at 56, 124 S. Ct. at 1367.

[¶29.] Depending on the circumstances, disclosures made during forensic interviews, such as J.C.'s statements to Strand at the Advocacy Center, may be testimonial. *See United States v. Eagle*, 515 F.3d 794, 802 (8th Cir. 2008) (declaring forensic interviews testimonial without discussion); *United States v. Bordeaux*, 400 F.3d 548, 555–56 (8th Cir. 2005). *See generally State v. McKinney*, 2005 S.D. 73, 699 N.W.2d 471. This is because one purpose of this type of forensic interview is to gather evidence of suspected physical or sexual abuse. The testimonial character of such statements is particularly salient when the child makes disclosures for purposes of memorializing evidence for law enforcement.

[¶30.] When J.C. disclosed the abuse at the Advocacy Center, "an objective witness [would have] reasonably . . . believe[d] that the statements would be available for use at a later trial." *See Crawford*, 541 U.S. at 52, 124 S. Ct. at 1364. After J.C. spoke with Strand, copies of the recorded interview and Strand's written report were distributed to law enforcement. The prosecution then used this evidence to build a case against Richmond in the 2015 prosecution. Accordingly, the statements J.C. made to Strand during the interview were testimonial and of a constitutional magnitude. We must then determine whether their admission constitutes a violation of the Confrontation Clause. A violation occurs when the

---

9. Although Richmond does not challenge the admission of his 2015 judgment of conviction, we note that public records, such as a judgment of conviction, are analogous to business records. Other courts have concluded the same. *See, e.g., State v. King,* 146 P.3d 1274, 1279–80 (Ariz. Ct. App. 2006); *Com. v. Crapps,* 835 N.E.2d 275, 276 (Mass. App. Ct. 2005).

witness making the testimonial statements is both unavailable and has not previously been subject to cross-examination. *See id.* at 59, 124 S. Ct. at 1369.

### B. Prior opportunity to cross-examine

[¶31.]     A defendant's constitutional right to cross-examine witnesses is "generally satisfied when the defense is given a full and fair opportunity to probe and expose a witness' infirmities through cross examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witnesses' testimony." *State v. Carothers*, 2006 S.D. 100, ¶ 16, 724 N.W.2d 610, 618. It is undisputed that Richmond never had occasion to cross-examine J.C. The State, however, asserts that the requirements of the Confrontation Clause were satisfied because Richmond cross-examined Strand, the witness repeating J.C.'s out-of-court testimonial statements. The State points to *State v. Kihega* to support this position. 2017 S.D. 58, ¶ 36, 902 N.W.2d 517, 528.

[¶32.]     We are unpersuaded by the State's reliance on *Kihega*. In that case, the witness testifying did not repeat the declarant's out-of-court statements. *Id.* ¶ 35, 902 N.W.2d at 528. Instead, he merely referenced, without including details, a previous conversation he had with an unavailable witness in order to correct an inaccurate inference made by defense counsel. *Id.* We classified the witness's statement as non-hearsay and held that the Confrontation Clause "does not bar out-of-court statements when the statement is not offered to prove the truth of the matter asserted[.]" *Id.* ¶ 36, 902 N.W.2d at 528. Indeed, the rule that the Sixth Amendment does not impact the admission of non-hearsay is now well-settled. *Williams v. Illinois*, 567 U.S. 50, 57, 132 S. Ct. 2221, 2228, 183 L. Ed. 2d 89 (2012).

Because the statements in *Kihega* were not hearsay, the Confrontation Clause analysis was entirely inapplicable. *Id.*

[¶33.]     The contents of J.C.'s testimonial statements at the Advocacy Center, though instrumental in resolving Richmond's case against J.C., were never subject to cross-examination by Richmond.  When Richmond accepted the State's offer and pled to child abuse in 2015, he waived his right to a jury trial and, with it, his right to confront and cross-examine J.C. with respect to that charge.  *See, e.g., United States v. Hill*, No. 07-15060, 2008 WL 2529574 at *1 (11th Cir. 2008) (noting that Confrontation Clause challenges are waived when a defendant pleads guilty).

[¶34.]     In the present case, however, Richmond did not waive his right to confront J.C. with respect to her allegations that he abused her.  Nor does the circuit court's decision to admit the evidence to prove identity, an element of the offense in this case, as well as common scheme or plan, mean that Richmond's constitutional right to confront his accuser disappeared.  When the circuit court decided to admit the statements of J.C., it violated Richmond's Sixth Amendment right of confrontation.  Having determined that the State failed to meet this prong for admissibility under *Crawford* we need not address Richmond's remaining argument that the circuit court erred by finding J.C. unavailable.

### C. Harmless Error

[¶35.]     When a defendant has shown his constitutional right to confrontation has been violated, he is entitled to a new trial unless the improperly admitted evidence constitutes harmless error.  We will deem an error harmless if we "may confidently say, on the whole record, that the constitutional error was harmless

beyond a reasonable doubt." *State v. Podzimek*, 2019 S.D. 43, ¶ 15, 932 N.W.2d 141, 146.

[¶36.]     Whether the error was harmless "depends upon a host of factors, all readily accessible to reviewing courts." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 106 S. Ct. 1431, 1438, 89 L. Ed. 2d 674 (1986). "These factors include the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony . . . [,]the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." *Id.*; *see also Kihega*, 2017 S.D. 58, ¶ 33, 902 N.W.2d at 527 (discussing the appropriate standard for harmless error).

[¶37.]     Based on our review of the records in this case, we conclude that the effect of the circuit court's error in admitting J.C.'s statements at trial was harmless beyond a reasonable doubt. Strand's testimony concerning J.C.'s interview was very brief, and no description was given of any of the abuse claimed by J.C. Moreover, although impermissible, this testimony relaying J.C.'s statement that she had been "victimized" by Richmond was limited to a few comments made in the middle of a four-day trial that involved ten witnesses and numerous exhibits. Further, Richmond's prior conviction for child abuse involving J.C. was introduced into evidence without objection, as was the testimony of the prosecutor who relayed information about the case and Richmond's plea agreement.

[¶38.]     The State presented a strong case. A.M. appeared in person and was the first witness to testify at trial. She described the manner in which Richmond

touched her private parts, including instances where he put his "thingy" which she identified as his penis inside of her. She explained where the events occurred and that Richmond had removed her clothing. In his assertion that the admission of the testimony at issue was not harmless error, Richmond points to unidentified DNA from semen found on sheets removed from a guest bed in Richmond's house. While A.M. had referenced this room when explaining where sexual acts had occurred, she testified at trial that the sexual acts had occurred mainly in Richmond's bedroom. A.M. also recounted the chain of events leading up to her decision to disclose the sexual abuse to her grandma.

[¶39.] The jury also considered Grandma's and Mother's testimony, which strongly corroborated the circumstances surrounding A.M.'s disclosure. Grandma described the multiple text messages she received from A.M. on June 26 and stated A.M. "sounded terrified" on the phone. Grandma also testified that when Mother confronted Richmond about the rapes over the phone, she heard him offer to let Mother "pull the trigger" and kill him once his affairs were in order.

[¶40.] When Mother took the stand, she explained her reaction to discovering Richmond had raped her daughter, which included thoughts of killing him. This testimony confirmed the reasons underlying Grandma's and A.M.'s hesitation to inform Mother about the sexual abuse. Like Grandma, Mother described the phone conversation she had with Richmond in which Richmond offered to let her kill him. While Mother was on the stand, the State also introduced the recorded phone call between Mother and Richmond, arranged by Detective Derby, in which Richmond requested the opportunity to read A.M.'s Advocacy Center report and to meet with

A.M. Richmond suggested that A.M. could "fix" the situation by refusing to cooperate with law enforcement.

[¶41.]     The State also presented testimony establishing that Richmond groomed A.M. with gifts immediately prior to both of her forensic interviews and before she met with Grandma after A.M. disclosed the abuse. As for physical evidence, the jury heard the expert testimony of Dr. Hamilton, a board-certified pediatrician, who had examined A.M. and testified that the deep notch found on A.M.'s hymen was consistent with penetration.

[¶42.]     At the close of the evidence, the circuit court gave the jury the final instructions of law which included a limiting instruction regarding the other acts evidence. The court instructed the jurors that if they chose to consider the testimony regarding Richmond's abuse of J.C., they could do so only for the limited purpose of proving Richmond's identity, common scheme, or opportunity to commit the charged offenses.[10] "Juries are presumed to follow the instructions of the [circuit] court." *State v. Eagle Star*, 1996 S.D. 143, ¶ 22, 558 N.W.2d 70, 75. The State, in its closing remarks, did not mention J.C.'s allegations. Instead, it

---

10.    Instruction 34 provided:

> Evidence has been introduced that the defendant committed an offense (or act) other than that which is now charged. Although evidence of this nature is allowed, it may be used only to show common scheme, opportunity, or identity of the person charged. You may not consider it as tending to show in any other respect the defendant's guilt of the offense with which the defendant is charged. Before determining whether to consider this evidence, you must first determine if a preponderance of the evidence established that the defendant committed the other acts or wrongs. You are not required to consider this evidence and whether you do is a matter within your exclusive province.

emphasized the plethora of evidence incriminating Richmond as to the charges relating to A.M. for which he was on trial. After reviewing the evidence presented at trial, the jury weighed the evidence and acquitted Richmond of three counts and convicted him of the fourth.

[¶43.] Based on the strength of the State's case against Richmond, the erroneously admitted statements, given their limited nature, had a minimal effect on the trial. Therefore, when considered in light of the evidence submitted at trial, the circuit court's admission of Strand's statements about J.C.'s disclosure, though erroneous, was harmless. We affirm.

[¶44.] GILBERTSON, Chief Justice, and JENSEN, SALTER, and DEVANEY, Justices, concur.